IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

JEWELL A. DIXON,
Plaintiff Pro Se,

v. Civil Action No.: ____________

EXACT BILLING SOLUTIONS, LLC
ICBD HOLDINGS, LLC
Defendants.

REC'D BY CW/C D.C.
JUN 23 2025
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

COMPLAINT

Plaintiff, JEWELL A. DIXON, brings this action against EXACT BILLING SOLUTIONS, LLC ("Exact Billing") and its affiliated or managing entity, ICBD HOLDINGS, LLC ("ICBD"), collectively referred to as "Defendants." Upon information and belief, ICBD exercises control, direction, or oversight over the operations of Exact Billing and shares legal responsibility for the violations described herein.

I. JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under federal laws including the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq.; the Genetic Information Nondiscrimination Act of 2008 (GINA), 42 U.S.C. § 2000ff et seq.; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

2. Venue is proper in this judicial district under 28 U.S.C. § 1391(b), as all events or omissions giving rise to these claims occurred in Broward County, Florida.

3. Plaintiff, Jewell A. Dixon, is a qualified individual with a disability under the ADA. She was employed by Defendant Exact Billing Solutions at its Lauderdale Lakes, Florida location, and during the relevant period, suffered from sickle cell disease, a serious and well-documented condition that substantially limits major life activities.

4. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). On June 5th, 2025, Plaintiff received a Notice of Right to Sue, attached hereto as Exhibit A. The EEOC investigator also confirmed in writing that Defendant Exact Billing Solutions failed to respond to the official EEOC Notice, demonstrating an additional layer of disregard for federal compliance and administrative

due process.

5. Throughout Plaintiff's employment, she was subjected to a hostile work environment stemming from her disability status, medical restrictions, and protected activities under the ADA and GINA. After making multiple internal complaints—including to direct supervisors, Human Resources, and executive leadership—regarding discriminatory conduct and workplace hostility, Plaintiff experienced heightened retaliation. This included denial of reasonable accommodations, public embarrassment, exclusion from workplace resources, and arbitrary enforcement of policy against her. Rather than address the hostile environment, Defendants responded with retaliatory acts intended to intimidate, isolate, and coerce Plaintiff into silence or resignation.

6. Rather than engage in the interactive process required by law, Defendants created conditions that were so hostile, retaliatory, and medically unsafe that Plaintiff's continued employment became impossible. Defendants' willful refusal to accommodate her documented disability, combined with ongoing retaliation and emotional coercion, culminated in a constructive discharge. Plaintiff's separation from the company was not voluntary and did not constitute a resignation. It was the direct and foreseeable result of Defendants' unlawful conduct in violation of the ADA, GINA, and Title VII.

7. These actions caused Plaintiff to suffer severe emotional distress, physical deterioration, loss of income, and long-term damage to her health and dignity. Defendants' conduct reflects a willful, malicious, and reckless disregard of federal law and Plaintiff's protected rights.

II. PARTIES

8. Plaintiff, Jewell A. Dixon, is a Black woman and resident of Broward County, Florida. At all times relevant to this Complaint, Plaintiff was employed by Defendant Exact Billing Solutions at its Lauderdale Lakes location and was qualified to perform the essential functions of her position with reasonable accommodation. Plaintiff is a qualified individual with a disability as defined by the Americans with Disabilities Act **(ADA)** and has also engaged in protected activity under the **Genetic Information Nondiscrimination Act (GINA)** and **Title VII of the Civil Rights Act of 1964**.

9. Defendant Exact Billing Solutions, LLC ("Exact Billing") is a Florida limited liability company operating as a billing services provider for behavioral health entities, including ABA Centers of America. Upon information and belief, Exact Billing maintains its principal place of business in Broward County, Florida, and conducts substantial business within the Southern District of Florida. Defendant is an employer within the meaning of the ADA, GINA, and Title VII.

10. Defendant ICBD Holdings, LLC is the parent or controlling entity of both ABA Centers and Exact Billing Solutions. ICBD Holdings is responsible for directing, managing, and maintaining human resource policies, payroll, and executive leadership for its subsidiaries, and is also an employer under federal law.

III. FACTUAL ALLEGATIONS FOR EEOC COMPLAINT AGAINST EXACT BILLING SOLUTIONS

11. Plaintiff Jewell A. Dixon is a qualified individual with a known and medically documented disability, sickle cell disease. A serious, chronic condition that constitutes a protected disability under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.

12. On January 27th, 2025, Defendant Exact Billing Solutions relocated Plaintiff's department to the second floor of its Lauderdale Lakes facility and significantly lowered the office temperature. At that time, Plaintiff was already suffering from ongoing emotional distress and psychological strain due to a hostile work environment, characterized by exclusion from workplace communications, retaliatory oversight, and unequal treatment compared to similarly situated employees. The exposure to the extreme cold, a known trigger for her disability (sickle cell disease) directly resulted in a severe medical episode, requiring two separate hospital visits within days.

13. In addition, Plaintiff was assigned a disproportionately high workload with inadequate training within the first week of being hired., forced to learn critical job functions by reverse-engineering procedures from unrelated roles. This unreasonable expectation created mental overload, increased error risk, and further contributed to Plaintiff's physical and emotional deterioration. These actions were not accidental—they represent a pattern of willful indifference and discriminatory neglect in violation of Plaintiff's rights under the **Americans with Disabilities Act (ADA)** and **Title VII**, and serve as further evidence of retaliation for Plaintiff's prior internal complaints.

14. Plaintiff's sickle crisis was documented in real time, during a Microsoft Teams meeting, which should be verifiable through internal company recordings. This incident marks the beginning of Plaintiff's health deterioration, triggered by sustained exposure to freezing office temperatures and compounding workplace stress. Plaintiff continued performing her job duties.

15. On January 31st, 2025, Human Resources issued Plaintiff a Reasonable Accommodation Request Form and a Medical Provider Authorization Form, forms that demanded an invasive level of medical detail and authorization, despite the company already possessing documentation of Plaintiff's disability, including hospital bands and a doctor's note. The invasive nature of the request, combined with a psychologically unsafe work environment, violated both the ADA's interactive process requirement under **29 C.F.R. § 1630.2(o)(3)** and Plaintiff's rights under the **Genetic Information Nondiscrimination Act (GINA)** by seeking overly broad disclosures.

16. Due to insurance complications, Plaintiff was unable to obtain a follow-up doctor's appointment. Upon reviewing the forms in more detail, she determined that the level of disclosure required was unreasonable, intrusive, and served as a deterrent rather than a support, effectively coercive rather than collaborative. Plaintiff did not feel safe continuing with the process under such conditions.

17. In the meantime, Defendant had been passively and informally accommodating Plaintiff by allowing access to a coffee machine that dispensed hot liquids.However, this measure was never formally recognized or tailored to Plaintiff's documented medical needs and failed to address the hazardous and inconsistent office temperatures that put her health at risk daily.

18. As a further consequence of her medical condition, Plaintiff was required to consume large quantities of fluids throughout the workday. Due to being tethered to her phone with no means of mobility, she was forced to hold her urine, triggering pain and increasing the risk of infection, a dangerous and humiliating condition that violated her basic human dignity and her ADA rights

19. To alleviate this issue, Plaintiff made multiple good-faith requests for a cordless headset, a reasonable and low-cost accommodation that would allow her to move freely and use the restroom while remaining on calls. Despite repeated outreach to management, these requests were either ignored, dismissed, or met with public ridicule. The first request was made to Director Crystal Roberts, who allegedly placed an order but never followed up.

20. On or about the morning of February 12th, 2025, Plaintiff made a verbal complaint to Human Resources representative Wanda Diaz, following a series of management actions that were both retaliatory and psychologically damaging. Plaintiff reported escalating exclusion, arbitrary reassignment, and refusal to clarify supervisory structure. The actions of management were so egregious that Wanda Diaz herself descended to the second floor to speak with Plaintiff, her coworkers, and the involved managers. A follow-up meeting was scheduled for February 17th, 2025 to allegedly clarify reporting hierarchy

21. On February 12th, 2025, that afternoon, Plaintiff submitted a formal internal email to Directors Vanessa Soto (her immediate supervisor of record) and Crystal Roberts (to whom she had been informally reassigned), outlining a pattern of escalating workplace exclusion, peer isolation, and retaliatory oversight. Composed while Plaintiff was still recovering from a recent medical episode, this email marked the first documented internal complaint regarding the hostile environment and retaliatory conduct tied to Plaintiff's disability and protected activity. The communication was intended to ensure these issues would be formally acknowledged and addressed in the upcoming meeting, which had been loosely proposed following Plaintiff's earlier verbal outreach to HR that same morning.

22. Plaintiff's email detailed exclusionary conduct observed upon her return from sick leave, including complaints from coworkers Brianna and Chianne S. that the Record Analyst (RAs) were routinely ignored by leadership, omitted from team communications, and excluded from collaborative functions such as meetings, training, and informal support

channels. These behaviors occurred in the wake of Plaintiff's documented sickle cell crisis, creating a pattern of isolation and retaliation in direct violation of **Title VII** and the **ADA's anti-retaliation clause** (42 U.S.C. § 12203).

23. Despite experiencing a sickle cell-related emergency that led to two hospital visits and visible emotional distress during a Microsoft Teams meeting, Plaintiff returned to work and proactively sought to bridge communication gaps, facilitate inclusion, and ease team friction. Her actions, including advocating for dividers, helping coworkers with tech issues, securing resources like cordless headsets and camera access, and participating in team morale events, demonstrate clear intent to maintain productivity and unity within a splintered environment.

24. The totality of Plaintiff's experience, her proactive leadership amid illness, the social isolation imposed on her and her peers, and the employer's coercive tactics, demonstrates not only a failure to engage in the ADA's required interactive process **(29 C.F.R. § 1630.2(o)(3))**, but also constructive retaliation and hostile work conditions designed to alienate her from advancement, protection, and dignity in the workplace.

25. On February 18th, 2025, Plaintiff submitted a second formal written complaint to Human Resources representative Wanda Diaz, with CEO Eric Frost copied on the communication. This second complaint enclosed Plaintiff's earlier internal grievance, which had been previously sent to both direct supervisors. Despite the seriousness of Plaintiff's initial complaint, including reports of departmental exclusion, opaque reporting structures, and emotionally unsafe working conditions, no corrective action was taken. Instead, the misconduct escalated. Plaintiff was met with heightened isolation, arbitrary managerial reassignment, and further psychological distress, constituting a retaliatory response to protected activity under **42 U.S.C. § 12203** (ADA) and **Title VII**.

26. Shortly before the February 17th, 2025, meeting convened to clarify reporting structure, Crystal Roberts, one of the directors involved in Plaintiff's ongoing reassignment, initiated a private conversation with Plaintiff, asking whether she preferred to remain in the Single Case Agreements department or return to Out Of Network department, stating that this would be the focal point of the upcoming meeting.

27. During that exchange Plaintiff expressed a desire for stability and inquired about applying for a "P2P Manager" position recently posted on the company's website. Plaintiff referenced her banking and operational leadership background and sought guidance on whether to formally apply. Crystal Roberts encouraged Plaintiff to pursue the role, stating that the Record Analyst position was "beneath her," that Plaintiff had "a lot to offer," and that she would personally speak with the P2P Director—who had previously reported to her, to facilitate the interview.

28. Crystal further asked if Plaintiff was hired through Robert Half, to which Plaintiff confirmed she was permanent. Crystal responded, "Good, that makes it easier," and assured Plaintiff she would notify the appropriate leadership once the application was

submitted. Plaintiff asked whether she should also notify Director Vanessa Soto, but Crystal Roberts insisted, "No, I'll speak to her."

29. However, within 1 hour of this exchange and without any intervening misconduct or explanation, Crystal Roberts abruptly reversed her position and emailed Plaintiff stating that she was barred from applying due to a previously unmentioned "12-month internal posting restriction." Plaintiff, acting in good faith, requested to see the policy in writing, citing recent internal promotions that appeared to contradict this alleged rule—namely that of Chelsea Robbins, who had been promoted to a managerial role within four months of employment and was still under the threshold of 12 months employment with the company..

30. The Plaintiff's efforts to transfer out of a hostile work environment was met with serious concerns of retaliation, favoritism, and discriminatory interference. The.Plaintiff explicitly stated in her email: "Either this policy was broken to accommodate that employee, or it was created solely to block me from leaving a hostile environment. If the latter, I am being retaliated against."

31. Plaintiff sought to clarify whether the newly cited "12-month internal posting restriction" was a legitimate policy or an arbitrary barrier created to block her from exiting a hostile environment. Plaintiff emphasized that her interest in the P2P Manager position stemmed not only from her qualifications and leadership background, but from a need to protect her mental health and employment stability amid persistent retaliatory conditions.

32. Plaintiff also documented how the hostile climate was so severe and pervasive that Crystal Roberts herself had previously referred to it as "a shit show"—a statement reflecting internal acknowledgment of dysfunction. Plaintiff reminded HR that her goal was not to disengage but to remain employed while removing herself from escalating emotional harm. She further highlighted the company's lack of adequate training, stating that employees were left to self-train and "figure out" their roles without proper support, a dynamic that contributed to emotional distress and institutional failure.."

33. Plaintiff stated that the imposition of a promotion restriction under such conditions amounted to deliberate emotional cruelty, undermining her ability to function and worsening the hostile conditions already reported. She cited her prior compliance with Wanda Diaz's request to escalate concerns only after management had been given a chance to resolve them, yet noted that management failed to act meaningfully, leaving her no choice but to pursue HR escalation.

34. These retaliatory acts constitute violations under both the **Americans with Disabilities Act (ADA), 42 U.S.C. § 12203**, which prohibits retaliation against individuals for asserting their rights, and the **Title VII of the Civil Rights Act of 1964**, which protects employees who oppose discriminatory practices or participate in an investigation.

35. The complaint concluded with the following warning:"At this point, I am raising a red flag to seek resolution for this issue which has now escalated to retaliation. Besides this being a personal issue for me now, I hope it sets a standard for others both now and in the future."

36. Approximately 30 minutes after submitting the February 18th, 2025, email, Plaintiff was summoned to a meeting with Human Resources representative Wanda Diaz, Director Vanessa Soto, and Director Crystal Roberts. During this meeting, Plaintiff specifically requested written policy language from the company's employee handbook supporting the alleged "12-month internal posting restriction" that had been used to deny her promotional opportunity. Wanda Diaz was unable to produce any such written policy, and instead referenced an internal email she had sent to management on February 10th, 2025. A directive that carried no formal policy authority or legal governance under company rules or published guidelines. The absence of an established policy, combined with the inconsistent enforcement of this alleged rule, further supports Plaintiff's assertion that the restriction was selectively applied in retaliation for her prior protected complaints, in violation of **Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)**, and **Section 503 of the ADA, 42 U.S.C. § 12203.**

37. During the course of this meeting, when Plaintiff raised concern over being deliberately excluded from a team meeting that included the three other SCA Record Analysts, Crystal Roberts responded in a demeaning and disrespectful manner. Director Vanessa Soto witnessing the exclusion and asked Plaintiff why she had not been invited to the meeting, Roberts dismissed Plaintiff's concern and stated: "Jewell, now you're acting erratic." This comment, made in front of HR and another director, was not only dismissive but also stigmatizing, especially given Plaintiff's recent medical episodes and protected status under federal disability law. The use of the term "erratic" further contributed to the hostile and retaliatory environment and constituted a form of character assassination intended to discredit Plaintiff's valid concerns.

38. Immediately after witnessing the exchange, Wanda Diaz instructed that Plaintiff would no longer report to Crystal Roberts and would instead be reassigned back to Director Vanessa Soto. Diaz also directed that Plaintiff be relocated to the UR OON (Utilization Review Out-of-Network) department area, effective immediately, separating her from the hostile dynamic. Following the meeting, Crystal Roberts sent a follow-up email confirming this change in reporting structure and location, an implicit acknowledgment of the inappropriate conduct that had just occurred in the meeting.

Phase II: Retaliation and Control Tactics

39. Confirmation of a Pattern from Departed Employee: March 2nd, 2025, Plaintiff confided in a colleague, Monique S., about the emotional strain she had been experiencing at Exact Billing Solutions. In response, Monique S. forwarded an internal email dated shortly before Plaintiff's hire, in which a previous employee described eerily similar patterns of harassment, emotional exhaustion, and unresolved abuse. That employee ultimately resigned due to Exact Billing's failure to intervene. The chilling overlap in treatment confirmed to Plaintiff that her situation was not an anomaly but part of a systemic failure

within the company to address known, repeated abuse. The emotional blow of realizing her pain was not isolated, but inherited, further destabilized her sense of safety and trust in leadership.

40. Selective Enforcement of Nonexistent Transfer Policy: On March 7th, 2025, Plaintiff inquired with Vanessa about transferring to a different role within the same department. Plaintiff was told she was ineligible due to a "12-month tenure requirement" for internal transfers. However, this restriction was arbitrarily and discriminatorily applied. Prior to this request, Francesa S., who had not yet reached 12 months of tenure, was granted a transfer from Utilization Review Specialist to the Diagnostics division. This was the second time Plaintiff was denied advancement under the pretense of an unwritten, non-existent policy, demonstrating clear favoritism and targeted obstruction of Plaintiff's professional growth.The pattern of selectively invoking fabricated policies to block Plaintiff's upward mobility constitutes retaliation, discriminatory treatment, and constructive interference with employment rights, all of which are actionable under **Title VII and the Florida Civil Rights Act.**

41. **Hostage-Level Psychological Terror:** On March 21st, 2025, a credible threat was made by a disgruntled employee, allegedly endangering lives within the facility. Despite the severity, Plaintiff and others were forcibly confined inside the workplace from approximately 10:30 AM to 2:00 PM without their consent, access to safety options, or adequate information. Employees were warned not to go near windows, clearly indicating awareness of potential harm—but no formal emergency protocols were initiated, nor were staff given the option to evacuate. This involuntary detainment, under conditions suggestive of imminent physical threat, constituted not only a gross violation of safety regulations but an act of psychological imprisonment. For Plaintiff, already under duress from systematic mistreatment, this moment ruptured any remaining sense of bodily autonomy. The COO and CFO, who worked in the same building and held clear command authority, failed to act responsibly.

42. Retaliation and Humiliation Following Second ADA Request: On or about March 13th, 2025, Plaintiff submitted a second request for a cordless headset to accommodate her mobility limitations with Vanessa Soto. On March 24th, 2025, three headsets were delivered. Shortly after, Plaintiff was publicly mocked by Chelsea Robbins, who raised her voice in front of colleagues and stated, "I don't think you should get a headset, but because Vanessa said to order them she said yes". And that, "other employees would want one if you get a headset." Minutes later, Plaintiff was privately reprimanded by Vanessa Soto, who falsely claimed she was ineligible because, "the headsets were only for managers, when the headsets are in close proximity they bleed into each other and everyone else would want one if you got a headset" Despite being a non-managerial employee, Laveda H, was given one of the three headsets and other non-managerial employee had received headset since the time of the Plaintiff hire.This incident constitutes a clear violation of **42 U.S.C. § 12112(b)(5)(A), including:**

- Discriminatory denial of reasonable accommodation

- Retaliatory humiliation of a disabled employee
- Failure to engage in the ADA-required interactive process
- Creation of a hostile work environment and emotional abuse
  Chelsea Robbins actions were reported to Vanessa Soto.This conduct directly worsened Plaintiff's medical condition. Witnesses to this verbal abuse and humiliation were Gunell D. and Natacha O.

43. Retaliation in Paper Form: As Plaintiff neared the conclusion of her three-month probationary period, Defendant issued a sudden and baseless disciplinary write-up on April 2nd, 2025. This action followed the Plaintiff's protected complaints, including concerns related to a hostile work environment and ADA accommodation barriers.The write-up was fabricated, lacking any documented warnings, prior incidents, or formal performance concerns. Its abrupt appearance contradicted previous verbal praise from team leads and reflected a stark departure from Plaintiff's actual work conduct. The timing and content of the write-up made clear that it was retaliatory in nature: a strategic move to discredit Plaintiff before she could complete her probationary period and qualify for broader employment protections.This act of reputational sabotage was intended to intimidate, silence, and provoke. It falsely depicted Plaintiff as insubordinate and unprofessional, triggering a wave of psychological distress. The emotional impact included anxiety, sleep disruption, and nervous system dysregulation, conditions that compounded Plaintiff's already fragile health.

44. Evidence of Informed Retaliation: On April 3rd, 2025, the Plaintiff courageously disclosed the full extent of her housing instability and emotional burden to Manager Vanessa Soto in a heartfelt and personal email. Plaintiff made it abundantly clear that she was homeless, living in her vehicle, and fighting to regain custody of her daughter. She emphasized her commitment to growth, her humility, and her desire to be seen—not pitied, but invested in. Despite this direct and vulnerable communication, management knowingly proceeded with calculated retaliation. The Plaintiff was stripped of dignity, denied advancement opportunities, subjected to surveillance, and ultimately forced into constructive discharge. This documented email, sent weeks before the employer's most aggressive acts of control, reveals one indisputable truth: they knew and still chose harm.

45. Executive Silence: In response to the unlawful retaliation, Plaintiff escalated her concerns directly to Exact Billing Solutions' executive leadership, including CEO Christopher Barnett, COO Michael Holzum, and CFO, Michael holohan on April 4th, 2025. Her detailed written complaint laid out a pattern of ADA violations, harassment, and psychological harm. Despite the serious nature of these allegations, none of the executives responded. Their collective silence functioned as an institutional endorsement of abuse. The lack of engagement by these decision-makers not only violated the company's own escalation protocols but demonstrated willful indifference to the health and safety of a medically vulnerable employee. Their non-response further exacerbated Plaintiff's emotional trauma, affirming that there would be no accountability, even at the highest levels.

46. HR Derailment Attempt: That same evening, Veloune Gelin, VP of Human Resources, issued what appeared to be a performative and superficial response. Despite the letter's documented severity and the urgency of Plaintiff's request, Gelin offered no meaningful engagement, only a vague acknowledgment of receipt that failed to address any of the allegations presented. In the days that followed, Plaintiff sent *three* separate follow-up emails attempting to secure a response or action plan. All three were met with complete silence. This deliberate stonewalling, after the executive team had been looped in, confirmed a coordinated effort to undermine Plaintiff's credibility, derail the complaint, and shield upper management from liability. The refusal to respond—especially after the invocation of homelessness and medical hardship—constitutes retaliatory neglect and evidence of a bad-faith effort to bury valid concerns under corporate inaction.

47. Probation Completion and Full Employment Status: Plaintiff's probationary period officially ended on April 6th, 2025. By that date, she had met the initial conditions of employment and transitioned into full employee status. Despite this, retaliatory actions escalated in the weeks that followed, most notably a baseless write-up issued on April 2nd, 2025, just days before her probation ended. The timing of this disciplinary action, combined with the lack of documented performance issues beforehand, reveals a deliberate attempt to preempt her transition into protected status. By the time of her constructive discharge on May 5th, 2025, Plaintiff had been employed beyond her probationary window for nearly a full month. This timeline eliminates any plausible claim that the employer's actions were part of a routine probationary evaluation. Rather, it affirms that the retaliation and denial of accommodations occurred after she became fully entitled to protection under the ADA, FCHR, and all relevant internal policies.

48. Unauthorized Surveillance Following Protected Activity: After Plaintiff submitted her formal complaint to the CEO, CFO, and COO, her work computer was remotely accessed and mirrored without consent at 7:48 AM, on Monday, April 7th, 2025. This covert breach occurred without notice, justification, or investigatory protocol, directly following protected whistleblower activity.The unauthorized system intrusion, documented with a timestamped photograph, constituted a clear act of retaliatory surveillance, violating Plaintiff's privacy rights and further compounding the hostile work environment. The timing and secrecy of this action underscore deliberate employer misconduct and unlawful monitoring practices.

49. Torture in the Cubicle: On Friday, April 17th, 2025, Plaintiff was informed by LaVeda H. that she was now required to report every movement during her workday. When Plaintiff asked whether this applied to her alone, LaVeda H. explicitly confirmed that it did. She later attempted to edit her message, but still confirmed selective enforcement. Shortly after this admission, other employees were belatedly sent a similar message in what appeared to be a clear attempt to cover tracks and create the illusion of equal treatment. This belated communication was not distributed transparently through a general team message, further suggesting pretext.The demand to report bathroom use, breaks, and task transitions was deeply humiliating and violated her rights as a salaried exempt employee under the Fair Labor Standards Act (FLSA). The psychological stress of being

micromanaged like a prisoner, combined with covert surveillance and whispers among coworkers, further shattered Plaintiff's dignity.

50. Orders Came from the Top: Leveda H. inadvertently confirmed that many of the punitive directives being imposed on Plaintiff came from "above." The CFO and COO worked in the same building as the Plaintiff. Her comment, though quickly downplayed, served as a smoking gun, validating that the hostile conditions were not isolated decisions by lower management, but orchestrated at the executive level. This admission further supports Plaintiff's claim that retaliation was institutionally sanctioned and strategically executed from the highest rungs of corporate power.

51. Constructive Setup: On April 18th, 2025, Plaintiff raised the concern again, about autonomy in an early morning email to management. No one responded. Hours later, at 4:14 PM, seven minutes after the Plaintiff clocked out at 4:07 PM. Manager Jessica Pastorino sent out the attached generalized "schedule clarification" email to the team. The timing strongly indicates it was reactive and performative, not proactive or genuine. Management did not expect Plaintiff to report to work on Monday, April 21st, 2025; however, when she did, she found this message in her inbox. A sign that the email was preloaded as a defense mechanism. The refusal to answer Plaintiff's direct inquiry, combined with the rushed effort to retroactively apply policy, demonstrates retaliatory intent, targeted monitoring, and a coordinated plan to discredit or isolate her following earlier protected activity.

52. Forced Immobilization Resulting in Spinal Aggravation and Disability Interference: On April 18th, 2025 Plaintiff was physically tethered to her assigned workstation and denied the autonomy to stretch, reposition, or leave without supervisory clearance, including for basic bodily relief such as restroom use. These inhumane restrictions directly violated Plaintiff's medical limitations and triggered severe spinal inflammation. This level of control constituted not only physical endangerment but also an egregious interference with Plaintiff's rights under the Americans with Disabilities Act (ADA), exacerbating her condition and placing her in medical distress.

53. PTO Withholding and Emotional Sabotage: Plaintiff had submitted a formal PTO request on March 20th, 2025, seeking time off to care for her daughter visiting from April 19th–22nd. Despite the advanced notice, management withheld approval until 1:00 PM on April 21st, 2025. This delay appeared to be strategically calculated, aiming to provoke Plaintiff into an absence that could be falsely labeled as job abandonment. As a result, Plaintiff was forced to leave her minor child unattended, adding extreme emotional duress to an already physically compromised state.

54. Forced Immobilization and ADA Violation Continued: On April 21st, 2025, Plaintiff returned to the worksite under duress after her previously requested PTO for April 21st–22nd, 2025 was never approved. That morning, she discovered a "schedule clarification" email in her inbox sent after she clocked out on April 18th, which she believed was not intended for her to see, as Defendants did not expect her to report to work. The message reinforced a culture of control. Although no directive was given to

remain seated, Plaintiff remained immobilized due to physical pain, fear of retaliation, and the psychological pressure to "endure and obey." Having already experienced similar tethering on April 18th, 2025, she refrained from stretching, repositioning, or leaving her desk. This prolonged immobilization caused acute spinal aggravation and emotional distress.

55. Medical Collapse and Hospitalization: April 21st, 2025, unable to reach her daughter by phone and burdened with the physical strain of transporting heavy work equipment without her vehicle. That afternoon the Plaintiff endured unrelenting pain and inflammation. Plaintiff had to ensure her daughter safely boarded her flight the next morning, April 22nd, 2025. Which resulted in her having to endure the pain over night. Due to her body being in agony for an extended amount of time, the Plaintiff was hospitalized with confirmed spinal compression, abdominal cramping, visible swelling, and nerve inflammation. This episode marked a total physical and mental collapse, directly caused by the employer's retaliatory tactics, ADA violations, and negligent disregard for human health.

Phase III: Unlawful Delay and Deliberate Indifference to Medical Crisis

56. Medical Notification Sent: On April 22nd, 2025 at 4:42 PM, Plaintiff notified senior management and HR that she was under medical care and unable to report to work on April 23rd, 2025. Her email was professional, timely, and included a clear intent to follow up with documentation. This message was sent to: Veloune Gelin (VP of HR), Vanessa Soto, Jessica Pastorino, Chelsea Robbins, and Wanda Diaz.

57. Ongoing Pattern of Retaliatory Silence: Despite the severity of Plaintiff's condition and her prior leadership escalation on April 4th, 2025, VP Veloune Gelin again refused to acknowledge receipt. Her silence was not accidental—it was part of a pattern. At this point, Plaintiff was hospitalized due to a spinal aggravation and sickle cell crisis triggered by prior workplace misconduct.

58. Jessica Pastorino's Directive: On April 23rd, 2025, while Plaintiff remained hospitalized, supervisor Jessica Pastorino responded—not with concern, but with instructions:

- Do not include the VP of HR (Veloune Gelin) in future emails.
- Send updates to Laveda H. (who was already involved in prior retaliation).
- Medical documentation was to go only to Wanda Diaz.

This maneuver shielded the VP from liability, disrupted transparency, and placed Plaintiff's emergency under the exclusive control of the very individuals who had participated in prior harassment.

59. Medical Documentation Submitted: Plaintiff submitted her sick slip to HR, confirming her doctor-ordered medical absence through April 29th, 2025.

60. Fabricated Leave of Absence: Only after Plaintiff submitted formal medical documentation did VP Veloune Gelin respond. Her reply ignored all previous context—including Plaintiff's hospitalization and the April 4th, 2025 complaint and instead stated the Wanda Diaz was working on a "leave of absence" for her. This implication was false, manipulative, and unauthorized.The Plaintiff never requested leave. The employer's characterization of her hospitalization as leave was a retaliatory tactic, meant to isolate, discredit, and eventually push her out.

Phase IV: Final Trigger – Constructive Discharge & ADA Retaliation

61. On May 5th, 2025, Plaintiff returned to the worksite while still under active medical restrictions, as previously documented by her physician. She arrived expecting a safe and lawful work environment, including the accommodations she had repeatedly requested under the Americans with Disabilities Act (ADA).

62. Instead, Plaintiff was informed she could not remain on-site unless she resumed full job duties, despite the following facts:

- A doctor's letter prohibiting lifting, twisting, and prolonged sitting had already been submitted;
- A formal request for a secluded space to safely stretch and rest between work periods was ignored;
- Cordless headset to support physical mobility and comfort was ignored;
- No ergonomic chair or modified workstation had been provided;
- The required equipment still exceeded 10 pounds, violating her medical restrictions.

63. This refusal to accommodate placed Plaintiff in a medically unsafe, emotionally hostile, and legally indefensible position. She was told she would not be paid unless she agreed to work under unaccommodated, dangerous conditions.

64. At 9:51 AM, while still physically present at the worksite, Plaintiff sent formal notice of constructive discharge, citing the employer's refusal to provide reasonable accommodations and the medically unsafe conditions she was subjected to.

65. Plaintiff: "I am writing to formally notify you that I am being constructively discharged as of today, May 5th, 2025... This is a hostile and unsafe environment, making it impossible for me to continue my employment without endangering my health and violating my legal rights... I am therefore left with no reasonable option but to remove myself from the workplace. This meets the legal definition of constructive discharge. I am not voluntarily resigning, nor am I abandoning my job."

66. This message was delivered to HR, the VP of HR, and management. It constitutes a legally binding declaration that Plaintiff's departure was not voluntary but rather the result of Defendants' repeated refusal to comply with the ADA, GINA, and Title VII. The timeline and conditions surrounding this final day of employment reflect retaliatory

interference, failure to accommodate, and constructive discharge under federal and state law.

Phase V: Retaliation & Post-Discharge Manipulation

67. Procedural Backpedaling and Retaliatory Paperwork (May 5th, 2025): Two hours after Plaintiff formally notified HR of her constructive discharge, the company issued a follow-up email from Samantha Boyne, reiterating a demand for internal ADA paperwork, including a "Reasonable Accommodation Application" and "Medical Information Request Form." The timing and tone of this message were not coincidental. It represented a clear act of post-discharge retaliation and procedural manipulation, designed to obscure the employer's non-compliance by retroactively requesting documentation after forcing Plaintiff out.

68. Key Language: "Unless you are able to submit your reasonable accommodation application by May 7th, 2025, we will be unable to provide you with a determination, and you will be expected to perform your job duties without any accommodations." — Samantha Boyne, May 5th, 2025, 12:02 PM

69. This email served not as a genuine continuation of the interactive process, but as an attempt to manufacture a defense after constructive discharge had already occurred.

70. Plaintiff immediately responded: "Your current email and attached forms come two hours after I left the premises and will be documented as a retaliatory and post-discharge attempt at procedural backpedaling." — Plaintiff Response, May 5th, 2025, 12:37 PM

71. Attempt to Reframe Constructive Discharge as Voluntary Resignation: On the morning of May 6th, 2025, Shanikwa Jno-Baptiste (Senior Regional HR Director) issued a misleading communication implying Plaintiff had voluntarily resigned, despite Plaintiff's documented position of constructive discharge: "If your recent correspondence and actions are intended to serve as a voluntary resignation, we respectfully request that you confirm this in writing…" — Shanikwa Jno-Baptiste, May 6th, 2025, 7:58 AM

72. Less than two hours later, the company unilaterally declared Plaintiff's resignation as voluntary, ignoring her explicit notice from the day prior: "This email serves as a formal confirmation of your voluntary resignation of employment... as a result of your refusal to complete and submit the required Reasonable Accommodation Request Form." — Shanikwa Jno-Baptiste, May 6th, 2025, 9:56 AM

73. This contradicts the Plaintiff's repeated position and attempts to rewrite the legal record to suggest abandonment or refusal, when in fact, the constructive discharge had already been triggered by the employer's failure to accommodate under ADA.

74. Plaintiff's Clarification and Legal Reaffirmation: Immediately upon receiving the mischaracterization, Plaintiff replied: "It is disingenuous to attempt to frame this termination as a voluntary resignation... I showed up for work... was met with evasion,

exclusion, and no offer of accommodation despite multiple prior requests supported by medical documentation... Your message today reflects a blatant disregard for ADA and FCHR protocols." — Jewell Dixon, May 6th, 2025, 10:22 AM

75. Plaintiff reiterated in three different emails that her departure was forced and directly caused by the employer's illegal conduct. Therefore, she was "constructively discharged."This message also clarified that her equipment return would proceed in a manner consistent with her medical restrictions.

76. Final Offboarding Email: Ironically, while still insisting on labeling her discharge as "voluntary," the HR department sent a formal termination packet minutes before Plaintiff's response. This email confirms that offboarding was processed despite the Plaintiff never submitting a resignation or abandoning her post. This premature and unauthorized finalization of separation reinforces the employer's retaliatory intent.

77. The Final Exchange – On May 7th, 2025 the Plaintiff returned to the worksite to complete the final exchange. She did not lift or carry any equipment, in compliance with her physician's restriction. Staff were assigned to carry her items, confirming in action what was denied in policy: that her medical condition was legitimate and that accommodation was possible.Plaintiff remained poised and professional throughout the process. She left with her personal items. This moment marked the official culmination of a constructive discharge, wherein Plaintiff's physical presence confirmed what her written complaints had warned for weeks: that Exact Billing Solutions had neither the intention nor the willingness to comply with federal disability law.

78. The Human Cost of Retaliation: Despite maintaining outward professionalism throughout her employment, Plaintiff suffered a profound psychological collapse shortly after being forced out. In the final days of April 2025, following weeks of denied accommodations, workplace hostility, and retaliatory efforts to discredit her. Plaintiff came dangerously close to a mental collapse, overwhelmed by the cumulative weight of unaddressed harm. The cumulative pressure of being forced to work under unsafe medical conditions, combined with the emotional devastation of being cut off from her daughter and betrayed by her employer, pushed her to a critical breaking point. Plaintiff has since pursued continuous care, including chiropractic treatment, emotional counseling, and spiritual grounding to restore her well-being. The trauma inflicted during and after her employment cannot be overstated. This breakdown represents the clearest evidence that Defendant's actions inflicted not only legal injury, but near irreparable human harm.

## IV. Causes of Action

**Count I – Failure to Accommodate under the Americans with Disabilities Act (ADA)**
Plaintiff realleges and incorporates by reference all preceding paragraphs. Defendant Exact Billing Solutions, LLC failed to provide reasonable accommodation despite valid medical documentation and repeated requests, in violation of 42 U.S.C. § 12112(b)(5)(A). As a result,

Plaintiff suffered physical harm, emotional distress, and was ultimately constructively discharged.

**Count II – Retaliation under the ADA and the Genetic Information Nondiscrimination Act (GINA)**
Plaintiff engaged in protected activity by disclosing her medical condition, requesting reasonable accommodations, and reporting discriminatory treatment. Defendant retaliated by denying her internal transfer opportunities, issuing a baseless disciplinary write-up, isolating her from support, and ultimately forcing her into a hostile and unaccommodated work environment. These actions violate 42 U.S.C. § 12203 and Section 210 of GINA.

**Count III – Constructive Discharge**
Plaintiff was forced to resign as a result of the intolerable and discriminatory working conditions created by Defendant. The refusal to accommodate, emotional coercion, and insistence that Plaintiff work under unsafe conditions without protection constituted a constructive discharge in violation of the ADA and related anti-retaliation statutes.

**Count IV – Hostile Work Environment Based on Disability**
The totality of the circumstances—including surveillance, denial of breaks, micromanagement, and targeted disciplinary action—created a pervasively hostile work environment on the basis of Plaintiff's disability. Defendant's conduct deprived Plaintiff of equal terms, conditions, and privileges of employment as protected under the ADA.

**Count V – Interference with Rights under the Genetic Information Nondiscrimination Act (GINA)**
Defendant unlawfully interfered with Plaintiff's GINA-protected rights by demanding unnecessary medical documentation, refusing to act on valid physician instructions, and directing Plaintiff to bypass standard ADA protocols. These actions constituted unlawful interference and coercion under GINA §§ 202(b) and 210.

**Count VI – Negligent Supervision and Retention**
Defendant knew or should have known that supervisors and HR personnel were engaging in unlawful, harmful behavior toward Plaintiff. Despite this knowledge, Defendant failed to intervene, allowing these individuals to continue violating federal protections and causing foreseeable harm, thereby breaching their duty of care.

**V. DAMAGES**

As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered and continues to suffer the following damages:

- Physical Harm:
  Plaintiff endured spinal cord injury due to being forced to sit in unsupported positions and lift objects in violation of her medical restrictions. She experienced chronic pain, nerve irritation, and recurring physical setbacks requiring ongoing chiropractic and medical care.

- Emotional and Psychological Distress:
  Plaintiff suffered severe emotional distress, including anxiety, panic attacks, depression, and nervous system dysregulation. She endured humiliation, retaliation, and manipulation that led to intense psychological trauma. At one point, Plaintiff reached a state of emotional collapse, dangerously close to self-harm — a consequence of unchecked abuse in the workplace while managing a medically vulnerable condition.

- Impact on Her Role as a Mother:
  Defendants' refusal to honor Plaintiff's lawful PTO request during a time of urgent need inflicted severe emotional trauma. Plaintiff was forced to leave her minor daughter unattended in order to report to work, despite providing advance notice and explanation. The guilt of abandoning her child in a moment of vulnerability — not out of neglect, but because of managerial cruelty — continues to haunt her. During this time, Plaintiff experienced intense emotional distress, unable to reach or protect her daughter, and overwhelmed by fear, rage, and helplessness. This mental pressure, compounded by exhaustion and medical suffering, pushed Plaintiff to the brink of collapse. Defendants' inhumane decisions nearly cost a child her mother. The emotional scars of that period are permanent, and the weight of what could have happened will never be forgotten.

- Financial Losses:
  Plaintiff suffered loss of income due to constructive discharge. She has incurred out-of-pocket medical expenses, transportation costs related to forced work commutes while her car was in repair, and hotel lodging due to housing instability worsened by job loss. These financial pressures have created lasting economic hardship.

- Reputational and Career Harm:
  Defendants' false characterizations and retaliatory write-ups tarnished Plaintiff's professional record, potentially jeopardizing future employment opportunities. Despite her qualifications and strong performance, she was painted as noncompliant, creating reputational injury.

- Loss of Dignity and Autonomy:
  Plaintiff was denied basic human dignity — tethered to a workstation, denied rest, made to work in pain, and subjected to verbal ridicule. Her ADA rights were dismissed, and her personhood was devalued by systems designed to protect her.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief:

- Compensatory damages in the amount of $26,000,000 for physical, emotional, and economic harm resulting from Defendant's discrimination, retaliation, and constructive discharge;
- Punitive damages for Defendant's willful, knowing, and egregious acts of discrimination and retaliation in violation of federal law;
- A declaratory judgment that Defendant violated Plaintiff's rights under the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), and related anti-retaliation provisions;
- Injunctive relief requiring Defendant to adopt, implement, and enforce ADA-compliant and anti-retaliation policies, procedures, and accommodations;
- An award of costs of litigation and reasonable attorneys' fees pursuant to applicable law;
- And such other and further relief as this Court deems just and proper.

Respectfully submitted,

JDixon

Jewell A. Dixon
Pro Se Plaintiff
212 E Hillsboro Blvd, Unit 373
Deerfield Beach, FL 33443
Email: jadsdixo75@gmail.com
Tel: 954-832-6543
Dated: 06/23/2025

Exhibit List:

1. Exhibit A – Notice of Right to Sue (EEOC):

2. Exhibit B – EEOC Investigator's Email (re: No Response):

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Miami District Office**
100 SE 2nd St, Suite 1500
Miami, FL 33131
(800) 669-4000
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 06/05/2025

**To:** Ms. Jewell A. Dixon
212 E Hillsboro Blvd, Unit 373
DEERFIELD BEACH, FL 33443

Charge No: 15D-2025-00945

EEOC Representative and email: ANTONIO CASTILLO
Investigator
Antonio.Castillo@eeoc.gov

---

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Evangeline Hawthorne
06/05/2025

Evangeline Hawthorne
Director

**Cc:**
NA NA
4620 N State Road 7 STE 200
FORT LAUDERDALE, FL 33319

Please retain this notice for your records.

Exhibit B

**ANTONIO CASTILLO** Jun 5, 2025, 12:21 PM

to me

Good morning,

They have not responded to the charge.

Sincerely,

*Antonio "Tony" Castillo*

Federal Investigator
U S Equal Employment Opportunity Commission (EEOC) - Miami District
Miami Tower
100 S. E. 2nd Street, Suite 1500
Miami FL 33131
(786) 648-5847
FAX: 305-808-1758