**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CV-61247-DIMITROULEAS/STRAUSS**

JEWELL A. DIXON,

     Plaintiff,

v.

EXACT BILLING SOLUTIONS, LLC
and ICBD HOLDINGS, LLC,

     Defendants.

                                 /

## REPORT AND RECOMMENDATION

THIS MATTER came before the Court upon Defendants' Motion to Dismiss Plaintiff's Amended Complaint and Incorporated Memorandum of Law [DE 24] (the "Motion"), which has been referred to me to take all necessary and proper action as required by law [DE 11, 36]. I have carefully reviewed and considered the Motion, the Response [DE 26], the Reply [DE 31], and all other pertinent portions of the record. For the reasons discussed below, I respectfully **RECOMMEND** that the Motion [DE 24] be **GRANTED IN PART** and that the Amended Complaint [DE 21] be **DISMISSED WITHOUT PREJUDICE** and **WITH LEAVE TO AMEND**.

## BACKGROUND

Plaintiff Jewell Dixon ("Plaintiff"), proceeding *pro se*, filed a six-count Amended Complaint against Defendant Exact Billing Solutions LLC ("Exact Billing") and ICBD Holdings LLC ("ICBD") (collectively, "Defendants"). *See generally* [DE 21]. Plaintiff alleges that Defendants violated several federal statutes, including the Americans with Disabilities Act of 1990 ("ADA"), the Genetic Information Nondiscrimination Act of 2008 ("GINA"), and Title VII of the

Civil Rights Act of 1964 ("Title VII").  *See id.* ¶ 1.  In addition to the alleged statutory violations, the Amended Complaint includes a state-law claim for negligent supervision and retention.  *See id.* ¶¶ 154-161.

Exact Billing hired Plaintiff, who is a Black woman with sickle cell disease and a "documented back injury," to work as a records analyst. *Id.* ¶¶ 3, 10-11.  According to Plaintiff, ICBD is Exact Billing's parent and controlling entity, "provid[ing] centralized Human Resources functions, leave administration, payroll, and accommodation oversight for [Exact Billing's] employees." *Id.* ¶ 12.

On January 27, 2025, Plaintiff suffered a "severe medical episode" at work due to her sickle cell disease.  *Id.* ¶¶ 14, 16.  The episode occurred after Plaintiff's department was relocated to another floor with "freezing" office temperatures and was "captured during a Microsoft Teams meeting."  *Id.* ¶¶ 14, 16, 18.  Plaintiff states in the Amended Complaint that "[c]old exposure is a well-known trigger for sickle cell crises." *Id.* ¶ 14.  Plaintiff alleges that her physical and emotional condition had already been aggravated by being assigned a "disproportionately high workload without proper training" and by being forced to reverse-engineer unrelated job functions during her first week of employment.  *Id.* ¶ 17.  The January 27, 2025 medical episode required hospital visits.  *Id.* ¶ 16.

Days after the medical episode, Exact Billing's human resources ("HR") department issued Plaintiff two forms.  *Id.* ¶ 19.  The first was a "Reasonable Accommodation Request Form," and the second was a "Medical Information Request Form."[1]  *Id.*  The first form asks the employee to

---

[1] The forms are not attached to the Amended Complaint.  However, Defendants attach them to the Motion.  *See* [DE 24-1] at 1-2; [DE 24-2] at 1.  The forms contain the same titles that Plaintiff uses in the Amended Complaint.  *Compare* [DE 21] ¶ 19, *with* [DE 24-1] at 1; [DE 24-2] at 1. Defendants assert the Court can consider the content of the forms in deciding the Motion because Plaintiff incorporated the forms by reference.  [DE 24] at 10 n.4 (citations omitted).  For support,

specify (1) the accommodation requested, (2) the job functions the employee is having difficulty with, (3) how the difficulty impacts the employee's performance, (4) what modifications would help, and (5) any other useful information. [DE 24-2] at 1. The second form asks for medical information from the employee to whom the form is given. [DE 24-1] at 1-2. The employee fills out the top section to authorize the release of medical information for determining the availability of accommodations. *Id.* at 1. The employee's physician or care provider fills out the second section by detailing the employee's condition. *Id.* at 1-2. The second page contains a GINA disclaimer that states in part, "[W]e are asking that you not provide any genetic information when responding to this request for medical information." *Id.* at 2. Plaintiff determined that the forms sought disclosures that were "unreasonable, intrusive, and coercive." [DE 21] ¶ 20. Plaintiff alleges that, when she received the forms, "Defendants had already been notified of Plaintiff's sickle cell condition through her written email disclosure and supporting medical absence slips."

---

Defendants cite several decisions from state courts. *See id.* Plaintiff correctly responds that those state court cases are "inapposite" and that this Court instead may consider documents outside the four corners of a complaint where the documents are (1) central to a plaintiff's claim and (2) undisputed in terms of authenticity. [DE 26] at 12 (citing *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005)). Despite correcting Defendants on the applicable standard, it does not appear that Plaintiff actually challenges the authenticity of the forms. *See* [DE 26] at 12-13; *see also* [DE 21] ¶¶ 19, 98, 120 (referencing forms). Plaintiff instead responds to Defendants' arguments regarding the forms. *See* [DE 26] at 12-13. Moreover, Plaintiff's Response makes clear that her GINA allegations are focused on Defendants' alleged demand for Plaintiff to disclose protected information under one of the forms (along with adverse actions against Plaintiff after she refused to do so). *Id.* at 10-13. The forms are thus central to the Amended Complaint because they are at the heart of Plaintiff's claim. Since Plaintiff also does not appear to dispute the forms' authenticity, the Court can consider them at the motion-to-dismiss stage without converting the Motion into one for summary judgment. *Cf. Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020) ("Although Luke contests whether he actually agreed to any compromise, he does not dispute that his complaint refers to the dismissal order, that the dismissal is central to his claim, or that the order is authentic. Thus, the district court did not err when it considered the order."); *Lowry v. Hwaseung Auto. USA, LLC*, No. 23-CV-524, 2024 WL 4194313, at *3 (M.D. Ala. Sept. 13, 2024) (relying on *Luke* and considering EEOC charge not attached to complaint on motion to dismiss because plaintiff referred to charge in complaint, charge was central to claim viability, and neither party disputed charge's authenticity).

*Id.* ¶ 19.  The Amended Complaint does not specify to whom the written email disclosure and supporting medical absence slips were sent, when Plaintiff sent them, or whether they described her condition and requested reasonable accommodation for it.  *See id.*

Although Plaintiff did not fill out the forms, Exact Billing informally allowed her to access hot liquids from the coffee machine, which provided Plaintiff some relief for the office temperatures.  *Id.* ¶ 21.  The hot liquids did not fully resolve Plaintiff's issues.  *Id.*  For instance, Plaintiff details how she must drink a lot of fluids during the day to improve her sickle cell condition.  *Id.* ¶ 22.  As a result, Plaintiff needed to use the restroom frequently, making it difficult for her to use her desk phone.  *Id.*  Plaintiff tried to address this issue by making "multiple good-faith requests for a cordless headset," which she thought was a reasonable accommodation.  *Id.* ¶ 23.  According to Plaintiff, Defendants never gave her a headset despite repeated outreach, instead ignoring requests or ridiculing her.  *Id.*  Plaintiff alleges that she even renewed her request for a cordless headset on March 13, 2025, over a month after her refusal to fill out accommodation forms.  *See id.* ¶ 57.  Around ten days after the renewed request, some cordless headsets arrived at the office.  *Id.* ¶ 58.  Plaintiff alleges that a manager mocked Plaintiff in front of others by stating, "I don't think you should get a headset, but because Vanessa said to order them [sic] she said yes." *Id.*  The manager continued, "[O]ther employees would want one if you get a headset."  *Id.*  Despite this exchange, Plaintiff did not get a headset.  *See id.* ¶ 59.  A director instead reprimanded Plaintiff and told Plaintiff that she was "ineligible" for a headset, as "they were only for managers."  *Id.*  Plaintiff alleges that several non-managers received headsets.  *Id.* ¶ 60.

At some point during her employment, Plaintiff began to perceive broader workplace problems.  *See id.* ¶ 24.  Plaintiff began making complaints to management about exclusion, retaliation, isolation, and other issues.  *Id.* ¶¶ 24-28.  A February 12, 2025 email to two directors

details several problems Plaintiff felt were affecting her work team. *Id.* at 44-45. Plaintiff sent another email complaint on February 18, 2025, copying Exact Billing's CEO, which again raised various issues related to the workplace. *Id.* ¶ 31, at 8, 41-43. The email depicts an incident where a director encouraged Plaintiff to apply for a "P2P Manager" position but later backtracked because an internal policy required an applicant to complete at least one year in their current role to be eligible. *Id.* at 41-43. Plaintiff challenged the legitimacy of the policy and questioned whether it was fabricated to keep her in a hostile work environment and retaliate against her. *Id.* ¶¶ 34-38. Plaintiff noted that another employee received a promotion to a managerial role without spending twelve months in her prior position. *Id.* ¶ 36. At a meeting later the same day, Plaintiff alleges no formal, written policy could be provided beyond an internal email. *Id.* ¶ 42. During that meeting, Plaintiff raised additional concerns about her exclusion from a separate team meeting earlier. One director responded by saying Plaintiff was "acting erratic." *Id.* ¶ 44. Later, Plaintiff asked to transfer to a different role in the same department, and a director told Plaintiff she also could not transfer because of a "12-month tenure requirement" for internal transfers, even though other employees supposedly transferred roles prior to being employed for twelve months.[2] *Id.* ¶ 49-52.

Plaintiff continued to escalate her work-environment concerns to executive leadership, but Plaintiff further alleges that her concerns of unlawful conduct were never addressed. *Id.* ¶¶ 70-74. According to Plaintiff, she was instead subjected to surveillance, micromanagement, and workplace gossip, including a policy that required Plaintiff to report movements during the day. *Id.* ¶¶ 76-79. These directives supposedly came from "above." *Id.* ¶ 79. Plaintiff alleges she was

---

[2] It is unclear whether this policy is the same policy as the one that prevented Plaintiff from applying to the P2P manager position.

"tethered" to her workstation and could not leave without clearance, aggravating her sickle cell condition and spinal injury. *Id.* ¶¶ 81, 83.

The Amended Complaint also details several other incidents, such as when she received a "disciplinary write-up" shortly before her probationary period ended, which Plaintiff alleges contradicted her prior positive feedback and appeared without warning. *Id.* ¶ 66-69. Another incident alleged is a security lockdown where "a credible threat was reported inside the facility." *Id.* ¶ 53. Plaintiff alleges that she and other employees were required to stay inside the workplace for a few hours. *Id.* Management did not allow Plaintiff and the other employees to leave during the lockdown and allegedly failed to initiate emergency protocols. *Id.* ¶ 54. Plaintiff asserts this incident constitutes the tort of false imprisonment under Florida law. *Id.* Plaintiff also alleges that her request for time off was intentionally delayed. *Id.* ¶¶ 82-84.

Eventually, Plaintiff went to a hospital for a sickle cell crisis and severe lower back pain. *Id.* ¶ 85. Plaintiff had to miss some work as a result. *Id.* ¶¶ 86-91. While she was out, she sent a letter to a representative from the HR department requesting accommodations for the back injury. *Id.* ¶ 89. The requested accommodations included a cordless headset (which she had already asked for because of the sickle cell condition), an ergonomic chair, and a private workspace not in an open-floor environment. *Id.* at 52. Another communication to the HR representative notes that Plaintiff provided a signed letter from her treating physician. *Id.* at 53. That physician's letter explained Plaintiff's recurring "back and sciatic issues," recommending weight restrictions and better work ergonomics for Plaintiff. *Id.* at 55.

When Plaintiff returned to work, Defendants had not provided the requested accommodations. *Id.* ¶¶ 92-93. One of the HR representatives told Plaintiff she could not remain on-site and would not be paid unless she worked without the requested accommodations. *Id.* ¶ 93.

Shortly after, Plaintiff sent a formal notice stating that she had been "constructively discharged." *Id.* ¶ 95. Plaintiff then received another request for her to fill out the accommodation forms, which she declined to do. *Id.* ¶¶ 98-99.

## LEGAL STANDARD

At the pleading stage, a complaint must contain "a short and plain statement of the claim showing the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). Although Rule 8(a) does not require "detailed factual allegations," it does require "more than labels and conclusions"; a "formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." *Id.* at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Iqbal*, 556 U.S. at 679)).

In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of the complaint." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002)). Courts must accept the factual allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 942 F.3d 1215, 1229 (11th Cir. 2019); *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1236 (11th Cir. 2019). But "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions

masquerading as facts will not prevent dismissal." *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citation omitted); *see also Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Moreover, "the court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)). "'[U]ndisputed' means that the authenticity of the document is not challenged." *Id.*

## ANALYSIS

### I.   SHOTGUN PLEADING

Defendants argue that the Amended Complaint constitutes a shotgun pleading[3] and should be dismissed because it does not comply with Rules 8 and 10. [DE 24] at 4-6; [DE 31] at 2-3. Plaintiff responds that the Amended Complaint satisfies Rules 8 and 10 and that the allegations put Defendants on fair notice of her claims, which are separated into six distinct counts. [DE 26] at 4-6. Although the Complaint is a shotgun pleading and should be dismissed, I conclude that dismissal should be without prejudice and that the Court should grant Plaintiff leave to amend.

As stated above, Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Additionally, Rule 10(b) requires that "[a] party . . . state its claims or defenses in numbered paragraphs, each limited as far as

---

[3] The Motion bases some of its "shotgun pleading" argument on allegations that appear in the Complaint rather than the Amended Complaint. *See, e.g.*, [DE 24] at 5 (asserting incorrectly that Plaintiff's Amended Complaint contains thematic phases in its factual narrative, such as "The Human Cost of Retaliation," "Fabricated Leave of Absence," and "PTO Withholding and Emotional Sabotage"). *Compare* [DE 1] ¶¶ 53, 60, 78 (using headings Defendants reference), *with* [DE 21] at 4-24 (lacking same headings and progressing without thematic phases).

practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). "Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). Shotgun pleadings fail to state a claim and thus may be dismissed. *See Weil v. Phillips*, 816 F. App'x 339, 341 (11th Cir. 2020) ("We conclude, as the district court did, that Weil's complaint failed to state a claim because it was a shotgun pleading.").

A few types of shotgun pleadings exist, but "[t]he unifying characteristic of all types of shotgun pleadings is that they fail to . . . give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323. The Eleventh Circuit previously identified four main types of shotgun pleadings: (1) the complaint contains multiple counts, but "each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint"; (2) the complaint is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (3) the complaint fails to separate each cause of action or claim for relief into different counts; and (4) the complaint "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 1321-23.

However, even when a complaint appears to be a shotgun pleading, the Eleventh Circuit has cautioned that "[a] dismissal under Rules 8(a)(2) and 10(b) is appropriate where 'it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief.'" *Weiland*, 792 F.3d at 1325 (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)); *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1207-08 (11th Cir. 2019) (declining to dismiss *pro se* plaintiff's complaint as a shotgun pleading because

9

it did not contain "endless irrelevancies" and defendant's argument for dismissal was "more hyperbole than substance"). Moreover, the Eleventh Circuit has stressed that "while this circuit's shotgun-pleading rule applies to everyone, [courts] ordinarily give *pro se* litigants more leeway when it comes to drafting." *Id.* at 1208. Regardless, the Eleventh Circuit "require[s] district courts to allow a litigant one chance to remedy a shotgun pleading." *Johnson v. Foster*, No. 23-10452, 2023 WL 7483830, at *2 (11th Cir. Nov. 13, 2023) (citing the *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018)).

Here, Plaintiff's Amended Complaint is a shotgun pleading. First, it improperly incorporates all preceding counts by stating at the beginning of each count that "Plaintiff realleges and incorporates all preceding paragraphs." [DE 21] ¶¶ 110, 123, 131, 139, 148, 154. The successive incorporation alone renders the Amended Complaint a shotgun pleading. *See Weiland*, 792 F.3d at 1321.

Second, the Amended Complaint contains numerous allegations that are conclusory, vague, immaterial, and not obviously connected to any particular cause of action. *See id.* at 1322. Throughout the Amended Complaint, Plaintiff repeatedly uses legal buzz words without sufficient substantiation. *See, e.g.*, [DE 21] ¶¶ 24-29, at 7-8, 44-45 (making allegations of retaliation but not including enough facts to indicate that a decision maker knew of a particular protected activity and took a materially adverse action against Plaintiff because of it). Compounding the issue, Plaintiff often uses terms like "retaliation" and "harassment" interchangeably. *See, e.g.*, *id.* ¶ 45 ("This stigmatizing remark was made immediately after Plaintiff's documented sickle cell crisis and repeated protected complaints. further [sic] discredited Plaintiff, perpetuated stereotypes about disability, and added to the *hostile*, *retaliatory* environment." (emphasis added)). Plaintiff also conflates supposed acts of retaliation and harassment with Defendants' alleged refusal to

accommodate Plaintiff's disabilities.  As a result, the Amended Complaint makes it difficult to delineate what conduct Plaintiff alleges violates what statute and when.  Elsewhere, the Amended Complaint contains allegations that are seemingly immaterial to her enumerated causes of action without more support.  For instance, Plaintiff alleges that she was assigned too much work during her first week without proper training, [DE 21] ¶ 17, that she was forced to "reverse-engineer" tasks from unrelated roles, *id.*, that her coworkers observed "Records Analysts" like Plaintiff were treated differently compared to other job roles, *id.* ¶ 28, and that management mishandled a "credible" security threat by (among other things) requiring staff to stay in the building for several hours without permitting evacuation, *id.* ¶¶ 53-56.  Yet the Amended Complaint does not clearly connect these allegations to Defendants' disability-based discrimination or the related causes of action she brings.

Third, the Amended Complaint fails to separate each cause of action into different counts. *See Weiland*, 792 F.3d at 1322-23.  The Amended Complaint includes six enumerated counts, but Plaintiff continuously alleges that Defendants' conduct violates other legal standards that are not included as causes of action.   For instance, Plaintiff alleges at various points that Defendants violated Title VII, *see, e.g.*, *id.* ¶¶ 78, 82, and falsely imprisoned Plaintiff during the security lockdown for the "credible" threat, *id.* at 12 n.3.  But Plaintiff does not enumerate counts based on either theory or clearly link the allegations for these theories to the six counts Plaintiff *does* enumerate.  The allegations are instead buried in the factual narrative, preventing Defendants from effectively framing a responsive pleading as to these claims.  Therefore, insofar as Plaintiff is attempting to allege claims for violations of Title VII, false imprisonment, or other unenumerated

11

causes of action, the Amended Complaint is a shotgun pleading.  *Weiland*, 792 F.3d at 1322-23.[4]

The Amended Complaint also blends retaliation claims under GINA and the ADA under one count

without distinguishing how the allegations apply to each.

Even so, I do not conclude that the *entire* Amended Complaint is "virtually impossible" to

decipher or that its irrelevancies are "endless."  *Weiland*, 792 F.3d at 1325; *Pinson*, 942 F.3d at

1207-08.  While the Amended Complaint contains many allegations regarding general workplace

conditions that are immaterial to Plaintiff's claims, it still lays out generally discernable allegations

of discrimination by Defendants stemming at least partly from Plaintiff's supposed disabilities.

The only major exception is Plaintiff's retaliation allegations, for which I conclude it is "virtually

impossible" to know which allegations of fact support her two retaliation claims.  *Weiland*, 792

F.3d at 1325.  Again, Plaintiff continuously uses the words "retaliation" and "harassment" as if

they are interchangeable, making it nearly impossible to discern what exactly she alleges

constitutes retaliation under each statute.  To make matters worse, Plaintiff combines her

retaliation claims under the ADA and GINA into a single count, without distinguishing which

allegations are relevant to which claim.  Additionally, the retaliation allegations are often

inconsistent with Plaintiff's exhibits and interspersed randomly.  But, as discussed below, because

I do not believe amendment would be futile (at least as to some claims), I conclude that dismissal

with prejudice is inappropriate.

---

[4] The Amended Complaint does not state a claim for false imprisonment or a violation of Title VII
either.  First, Plaintiff does not allege enough facts raising a plausible inference that the lockdown
was unlawful.  Second, even though Plaintiff alleges that she is a Black woman, she does not
indicate how Defendants acted improperly based on Plaintiff's race, color, sex, or other protected
characteristic under Title VII.

## II.    ADMINISTRATIVE EXHAUSTION

Defendants argue that Plaintiff did not sufficiently plead that she exhausted administrative remedies as a condition precedent to filing her statutory claims. [DE 24] at 6. Specifically, Defendants point out that Plaintiff did not identify the date on which she filed her charge of discrimination and did not reference whether the allegations in the Amended Complaint are within the scope of her EEOC charge. *Id.* Plaintiff responds that she has satisfied the administrative prerequisites, meaning the Court can properly hear the claims. [DE 26] at 6-7. I conclude Plaintiff sufficiently pleaded the exhaustion of administrative remedies. The Amended Complaint should not be dismissed on this basis.

Administrative exhaustion is a condition precedent to filing a lawsuit under the statutes Plaintiff invokes. *See E.E.O.C. v. Summer Classics, Inc.*, 471 F. App'x 868, 869-70 (11th Cir. 2012) (ADA); *Karupaiyan v. Experis US Inc.*, No. 24-580, 2025 WL 615179, at *2 (2d Cir. Feb. 26, 2025) (GINA); *Barrett v. Reeves Constr. Co.*, No. 4:24-CV-237, 2025 WL 1399211, at *7 (S.D. Ga. May 14, 2025) (GINA); *Giles v. BellSouth Telecommunications, Inc.*, 542 F. App'x 756, 758 (11th Cir. 2013) (per curiam) (Title VII). Federal Rule of Civil Procedure 9(c) states the following requirement for pleading conditions precedent: "In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed."[5] Fed. R. Civ. P. 9(c). The Eleventh Circuit has applied Rule 9(c) in a Title VII case, explaining that "a plaintiff must generally allege in his complaint that 'all conditions precedent to the institution of the lawsuit have been fulfilled.'" *Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992, 1010

---

[5] Rule 9 also addresses the requirements for denying the performance or occurrence of conditions precedent. *See id.* ("But when denying that a condition precedent has occurred or been performed, a party must do so with particularity."). However, Defendants have not denied Plaintiff's lack of performance of conditions precedent with particularity. Instead, Defendants argue only that the Amended Complaint lacks "critical details." [DE 24] at 6.

(11th Cir. 1982); *see also* 42 U.S.C. § 12117(a) (incorporating Title VII's procedural requirements into ADA); 42 U.S.C. § 2000ff-6(a)(1) (incorporating Title VII's procedural requirements into GINA). In *Myers v. Central Florida Investments, Inc.*, 592 F.3d 1201, 1224 (11th Cir. 2010), the Eleventh Circuit similarly explained that a plaintiff had satisfied Rule 9(c)'s pleading standard by making a general statement in her complaint that she "received her Notice of Right to Sue letter from the U.S. Equal Employment Opportunity Commission within 90 days before filing this action, and has otherwise fulfilled all conditions precedent to institution of this action." This Court has similarly denied a motion to dismiss a plaintiff's ADA claims where the complaint contained general allegations that conditions precedent have been fulfilled and that the plaintiff's charge and lawsuit were timely. *See Vargas v. Fla. Crystals Corp.*, No. 16-81399-CIV, 2017 WL 11536186, at \*5 (S.D. Fla. May 30, 2017).

Here, the Amended Complaint contains general allegations that Plaintiff satisfied conditions precedent under the ADA, Title VII, and GINA. *See* [DE 21] ¶¶ 4-6. Therefore, Plaintiff has sufficiently pleaded administrative exhaustion. The Amended Complaint alleges the following: (1) Plaintiff "timely filed a Charge of Discrimination" with the EEOC and FCHR; (2) "the EEOC issued Plaintiff a Notice of Right to Sue"; and Plaintiff has "satisfied all conditions precedent to filing this action under the ADA, GINA, and Title VII." [DE 21] ¶¶ 4-6. These allegations do not substantively differ from the general allegations by the plaintiffs in *Myers* and *Vargas* and therefore satisfy Rule 9(c)'s lenient standard for pleading conditions precedent. *See* 592 F.3d at 1224; 2017 WL 11536186, at \*5. The Amended Complaint should not be dismissed on this basis.[6]

---

[6] Assuming that Defendants deny with particularity how Plaintiff has failed to satisfy conditions precedent when they ultimately file an answer, issues such as whether Plaintiff filed a timely charge of discrimination or whether Plaintiff's allegations here are like, related to, or grow out of

III.   FAILURE TO STATE A CLAIM

A.  Count I (Failure to Accommodate Under the ADA)

Defendants argue that Plaintiff failed to allege enough facts showing Defendants knew of limitations that would qualify Plaintiff as disabled.  [DE 24] at 7.  Defendants also argue that Plaintiff failed to establish that she is a qualified individual under the ADA.  *Id.* at 8.  The Motion stresses that Plaintiff did not allege that she completed the accommodation forms given to her.  *Id.* Defendant further asserts that Plaintiff's Amended Complaint "fails to allege what accommodation she actually requested."  *Id.* at 9.  I disagree.  Liberally construed, the factual allegations in Plaintiff's Amended Complaint are enough at this stage to state a discrimination claim based on a failure to accommodate.

"The ADA prohibits employers from discriminating against disabled employees."  *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015) (citing 42 U.S.C. § 12112(a)). "To state a discrimination claim under the ADA, a plaintiff must allege sufficient facts to plausibly suggest (1) that she suffers from a disability, (2) that she is a qualified individual, and (3) that a covered entity discriminated against her on account of her disability.'"  *Id.* (citation modified); *see Godbee v. Sam's W., Inc.*, No. 21-60513-CIV, 2022 WL 2804843, at *6 (S.D. Fla. Feb. 17, 2022) (Dimitrouleas, J.).

The crux of Defendants' argument addresses whether Plaintiff alleges that she made Defendants aware of any disability and actually requested accommodations.  *See* [DE 24] at 7-9. At best, Defendants provide only perfunctory analysis regarding whether Plaintiff alleged she was disabled and whether she alleged that she was a qualified individual.  *See id.*  I thus focus the

the allegations in her EEOC and FHCR charges, can be addressed at summary judgment.  *See Gregory v. Ga. Dep't. of Hum. Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004).

15

analysis on whether Plaintiff adequately alleged that a covered entity discriminated against her on account of her disability.[7]

"[A]n employer's failure to reasonably accommodate an 'otherwise qualified' disabled employee itself constitutes unlawful discrimination, unless the employer can show 'undue hardship.'" *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1249 (11th Cir. 2007); *Jackson v. Alto Experience, Inc.*, 716 F. Supp. 3d 1327, 1347 (S.D. Fla. 2024) (citing *id.*). A plaintiff must allege sufficient factual content from which it can be plausibly inferred that the defendant knew of the plaintiff's disability. *See* 42 U.S.C. § 12112(b)(5)(A); *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1335 (11th Cir. 2022) (citing *id.*). "Further, an employer's duty to provide a reasonable accommodation is not triggered unless the employee makes a specific demand for an accommodation." *Oirya v. Mando Am. Corp.*, No. 23-11429, 2024 WL 1462500, at *5 (11th Cir. Apr. 4, 2024) (citing *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999)).

Starting with Plaintiff's sickle cell condition (and liberally construing the Amended Complaint and taking all inferences in Plaintiff's favor), Plaintiff alleges enough facts to state a plausible failure-to-accommodate claim. Defendants argue Plaintiff did not satisfy her burden to

---

[7] Regardless, I conclude Plaintiff plausibly alleged these first two elements. Plaintiff adequately alleges that she suffers from a disability for the sickle cell condition by detailing how the condition impacts her ability to work (e.g., hospitalizations partially triggered by office conditions and difficulty staying at her desk near the phone), which is a major life activity. *See* 42 U.S.C. § 12102(1)(A) (defining disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual"); *id.* § 12102(2)(A) (including working as a major life activity). She also alleges how her back injury is a disability because it causes recurring symptoms that affect her ability to work and lift, which are both major life activities. *See id.* § 12102(2)(A). Plaintiff also adequately alleges that she was a qualified individual because she explains that she could perform all essential job functions despite both disabilities if given reasonable accommodations, which would include things like a cordless headset, ergonomic chair, and modified equipment weight limits. [DE 21] ¶ 13. Therefore, the first two elements of her ADA discrimination claim are plausibly alleged.

plead that Defendants knew she was disabled and that Plaintiff requested a reasonable accommodation for her disability. [DE 24] at 7-9. Specifically, Defendants assert that Plaintiff's allegations of her episode while on a Microsoft Teams meeting and the doctor's note from later in Plaintiff's employment are insufficient. *Id.* I agree with Defendants to a degree. Plaintiff's allegations regarding the episode that occurred on Microsoft Teams are vague to the extent that Plaintiff does not specify what actually happened. While Plaintiff's allegations make clear that she suffered a "crisis," [DE 21] ¶ 18, the Amended Complaint does not describe how this "crisis" manifested, what (if anything) Plaintiff said or did during the episode, or (most importantly for the concept of notice) what her co-workers would have observed via Microsoft Teams. In other words, it is hard to know how Defendants were supposed to understand the cause of Plaintiff's "crisis," much less that it stemmed from an underlying medical condition that Defendants needed to accommodate. Indeed, if Plaintiff intends to rely so heavily on the episode that occurred on Microsoft Teams to demonstrate Defendants' awareness of her condition (as her Response suggests), Plaintiff should provide more detail in any further amended complaint.

But regardless of what occurred during the Microsoft Teams meeting, Plaintiff also alleges that, by the time Defendants issued her the accommodation forms a few days after it, "Defendants had already been notified of Plaintiff's sickle cell condition through her written email disclosures and supporting medical absence slips." [DE 21] ¶ 19. Plaintiff further alleges that, in trying to address her need for frequent restroom breaks as a result of her sickle cell condition, she "made multiple good-faith requests for a cordless headset . . . ." *Id.* ¶ 23. Plaintiff notes the initial request was made to a particular director whom she names in the Amended Complaint. *Id.* Moreover, Plaintiff alleges that she renewed her request for a headset on March 13, 2025—more than a month after the Microsoft Teams incident. *See id.* ¶ 57. So, even though Plaintiff never states in any

17

clear or direct way when she first notified Defendants of the sickle cell condition or when she first expressly sought accommodations for it, when liberally construed and pieced together (and taking all inferences in Plaintiff's favor), the allegations raise a plausible inference that Plaintiff told Defendants during her employment that she had a sickle cell condition and needed an accommodation for it.

However, these various requests never materialized.  *See id* ¶¶ 23, 57-59, 64.  According to Plaintiff, Defendants ignored, dismissed, and denied her requests.  *Id.* ¶ 23.  Even in her email stating that she had been constructively discharged, Plaintiff alleges that she received a call from someone in the HR department who said that the "ADA accommodations are denied."  *Id.* at 51. Liberally construed, Plaintiff sufficiently alleged that she informed Defendants of her sickle cell condition and requested accommodations that Defendants denied.

I reach a similar conclusion for Plainitff's back injury.  Although it appears that Plaintiff did not inform Defendants of her back injury and the need for accommodation until months into her employment, she still did so.  Plaintiff sent a letter dated May 1, 2025, which had the following subject line: "Re: Request for Reasonable Accommodation Under the ADA & Medical Support Letter."  [DE 21] at 52 (emphasis removed).  Plaintiff stated in the letter, "I am writing to formally request a reasonable accommodation under the Americans with Disabilities Act . . . ."  *Id.*  She further specified that she had "an acute lower back injury" and requested several specific accommodations.  *Id.*  Plaintiff returned to work a few days after the date of the letter (she had missed some time due to hospitalization for a sickle cell crisis and severe lower back pain).  *Id.* ¶¶ 85-86, 89, 91-92.  After Plaintiff arrived at work, an HR representative told Plaintiff that Plaintiff could not remain on the premises and would not be paid unless she worked without accommodations.  *Id.* ¶¶ 92-94.  A different HR representative also told Plaintiff on the phone that

the ADA accommodations were being denied. *Id.* at 51. These allegations plausibly allege that Plaintiff informed Defendant of the need for reasonable accommodations related to the back injury, asked for specific accommodations, and did not receive them because the requests were denied.

Even so, Defendants argue that Plaintiff failed to fill out the accommodation forms Defendants gave her. [DE 24] at 8-9; [DE 31] at 4. But Plaintiff is right that she did not need to use magic words to initiate a proper accommodation request. *See Magwood v. RaceTrac Petrol., Inc.*, No. 22-12501, 2024 WL 1254932, at *5 (11th Cir. Mar. 25, 2024) ("[A]n employee 'need only identify a statutory disability and explain generally how a particular accommodation would assist her.'" (quoting *Owens*, 52 F.4th at 1336)). In addition, the issue of whether Plaintiff refused to engage in the interactive process is better resolved at the summary-judgment stage. *Cf. Barry v. Soash*, No. 1:17-CV-2 (LJA), 2018 WL 715404, at *4 (M.D. Ga. Feb. 5, 2018) (explaining that issue of whether plaintiff refused to engage in interactive process by not filling out health questionnaire was more appropriately addressed at summary judgment and concluding plaintiff stated plausible claim). Despite the Amended Complaint being a shotgun pleading in general (and despite the fact that her allegations on Count I could benefit from additional detail and clarification), Plaintiff's allegations on Count I satisfy the plausibility threshold. Therefore, Count I should not be dismissed on this basis.

### B. Count II (Retaliation Under the ADA and GINA)

As explained while addressing whether the Amended Complaint is a shotgun pleading, Plaintiff's retaliation allegations are nearly impossible to piece together. Yet, even upon trying to piece them together, I conclude Plaintiff fails to state a claim with her current allegations.

The ADA and GINA contain anti-retaliation provisions with nearly identical language. *See* 42 U.S.C. § 12203(a); 42 U.S.C. § 2000ff-6(f). "To prevail on her ADA retaliation claim, Plaintiff

19

must show that: (1) she engaged in a statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was a causal link between the two." *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001)).  The same elements apply to a GINA retaliation claim.  *See, e.g.*, *Conner-Goodgame v. Wells Fargo Bank, N.A.*, No. 12-CV-03426, 2013 WL 5428448, at *10 (N.D. Ala. Sept. 26, 2013) (applying above elements to GINA).

Starting with the ADA, Plaintiff plausibly alleges two types of protected activities.  The first is Plaintiff's accommodation requests.  *See Frazier-White*, 818 F.3d at 1258 (stating request for accommodation is protected activity).  Though, as discussed above, Plaintiff's allegations are vague about exactly when and how she requested accommodation for her sickle cell condition. Yet liberally construing her allegations, she has sufficiently alleged that she sought accommodations for that condition at some point.  Further, she has sufficiently alleged that she sought accommodations for her back injury, albeit only at the very end of her employment.

Plaintiff asserts in her Response that she engaged another type of protected activity— opposition activity, in the form of invoking her ADA rights and objecting "to the coercive and invasive nature of the 'medical information' demand forms." [DE 26] at 13.  For support, Plaintiff cites paragraphs nineteen and twenty of the Amended Complaint.  *Id.*  But these paragraphs do not contain the allegations Plaintiff claims they do.  *See* [DE 21] ¶¶ 19-20.  Contrary to Plaintiff's assertions, paragraph nineteen does not state that Plaintiff expressly invoked the ADA's protections; Plaintiff merely alleges there that she "notified" Defendants of her sickle cell condition.  *Id.* ¶ 19.  If Plaintiff is suggesting that this action was opposition conduct, she is wrong. To the extent that Plaintiff is instead suggesting that her opposition conduct was her refusal to fill out the forms and protest that the forms violated the ADA, such conduct could be a protected

activity.  However, while Plaintiff alleges that she thought forms were "unreasonable, intrusive, and coercive," *see* [DE 21] ¶ 20, she does not allege that she communicated her objections to Defendants or otherwise explained to anyone why she refused to complete the forms, at least when she initially received them.  The only allegation or illustration of Plaintiff plausibly communicating to Defendants that she was refusing to complete the accommodation forms out of a belief that they violated the ADA comes in early May, right before the end of her employment, when her letter to an HR representative dated May 1, 2025, expressly states that Plaintiff was refusing to fill out the forms partly because of her ADA protections.  *See* [DE 21] at 53.  Therefore, while Plaintiff plausibly alleges she engaged in protected opposition conduct, she only plausibly alleges that she did so through her May 1, 2025 letter.

Next, Plaintiff alleges at least one adverse employment action.  For retaliation claims, adverse employment actions are those that are materially adverse, meaning they would dissuade a reasonable person from engaging in the protected activity.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citations omitted); *Shannon v. Postmaster Gen. of U.S. Postal Serv.*, 335 Fed. App'x 21, 26 (11th Cir. 2009) (applying *Burlington* to ADA retaliation).  Yet material adversity does not include "trivial" harms.  *Burlington*, 548 U.S. at 67-68.  At various points, Plaintiff claims several of Defendants' actions qualify as adverse employment actions, such as a disciplinary write-up, *id.* ¶¶ 66-69, micromanagement, *id.* ¶ 77, a denial of a promotion or transfer opportunity, *see id.* ¶¶ 33-39, 49-52, and constructive discharge, *id.* ¶ 132.[8]  Write-ups and

---

[8] Plaintiff mentions a panoply of alleged negative treatment in other parts of the Amended Complaint.  *See* [DE 21] ¶¶ 15, 24, 26, 28 (alleging exclusion from communications, isolation, and reassignment of duties).  However, these allegations are all vague, lacking the kind of factual detail that would indicate that they plausibly rise to the level of a materially adverse action.  Moreover, based on the way these circumstances are alleged, it is impossible to conclude that they were plausibly related to Plaintiff's requests for accommodation or other protected activities because Plaintiff alleges that she was "already suffering" from this kind of treatment at the time of

21

micromanagement generally are not considered materially adverse employment actions. *See Lucas*, 257 F.3d at 1261 (negative evaluations); *Collins v. Ala. State Univ.*, No. 23-CV-00231, 2025 WL 1070437, at *7 n.5 (M.D. Ala. Feb. 3, 2025) (heightened scrutiny), *report and recommendation adopted*, 2025 WL 928821 (M.D. Ala. Mar. 27, 2025).  Further, Plaintiff cannot rely on constructive discharge as an adverse employment action here because she is essentially re-packaging her failure-to-accommodate claim.  She alleges being "constructively discharged" because she was forced to work without her requested accommodations that Defendants denied. [DE 21] at 51.  "But a plaintiff may not point to the denial of th[e] reasonable accommodation as an adverse action." *Jimenez v. U.S. Att'y Gen.*, 146 F.4th 972, 999 (11th Cir. 2025) (citing *Lucas*, 257 F.3d at 1261).[9]  So only the promotion denial could qualify as a materially adverse under Plaintiff's current allegations.  *See, e.g.*, *Mann v. Miami-Dade Cnty. Corr. & Rehab.*, No. 09-22456-CIV, 2010 WL 11426147, at *6 (S.D. Fla. July 27, 2010) ("Mann's denial for promotion amounts to a materially adverse action.").

For causation, however, Plaintiff does not adequately connect the denial of a promotion or transfer opportunity to either her requests for accommodation or her refusal to fill out the accommodation forms.  "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716

---

her sickle cell crisis on January 27, 2025, *see id.* ¶ 15, and she appears to allege that at least some of this perceived unfair treatment was directed at both Plaintiff and other employees, *see id.* ¶ 28.

[9] If Plaintiff instead means she was constructively discharged because working conditions were intolerable, she necessarily cannot state a claim because the standard for constructive discharge is even more stringent than the standard for a claim based on hostile working environment.  *See Cheatham v. DeKalb County*, 682 Fed. App'x 881, 890 n.8 (11th Cir. 2017) (citing *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009)).  As I explain in my analysis of Count IV below, Plaintiff has not plausibly alleged that Defendants' conduct constitutes a hostile work environment.

(11th Cir. 2002) (citation omitted). "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." *Id.* at 716-17 (citation omitted). For the accommodation requests, the issue is that Plaintiff muddies the entire timeline in the Amended Complaint. For instance, Plaintiff's allegations are vague at times regarding what accommodations she sought for her sickle cell condition, how she made her requests, who she made each request to, and when she did so. Further, her allegations about asking for a cordless headset are vague as to the timing of the requests. Without clearer allegations addressing the above areas, Plaintiff cannot plausibly allege that a promotion or transfer request was denied because Plaintiff requested accommodations for her sickle cell condition. Plaintiff points to temporal proximity to argue otherwise, but she cannot state a claim by vaguely gesturing at the chronology of events as a whole. *See* [DE 21] ¶ 126; [DE 26] ¶ 45, at 14. Plaintiff's request for accommodations for her back injury also cannot be used to show causation, as the accommodation request for the back injury post-dates any supposed denial of a promotion or transfer opportunity. The same is true for Plaintiff's refusal to fill out accommodation forms. Only her later refusal to fill out the forms in May 2025 has been adequately alleged as a protected activity, and that protected activity post-dates the supposed denial of a promotion or transfer opportunity. So, while Plaintiff may be able to state an ADA retaliation claim with another amendment, she currently does not.

The Amended Complaint does not state a GINA retaliation claim either. One of the protected activities Plaintiff alleges is that she disclosed her sickle cell condition. [DE 21] ¶ 124. But she does not allege facts plausibly suggesting that Defendants took materially adverse actions against her because she disclosed the condition. *See Bonanza v. Walmart Corp.*, No. 24-CV-1076, 2024 WL 5671535, at *4 (M.D. Fla. June 17, 2024) ("To the extent Plaintiff seeks to assert a claim

23

under GINA's anti-retaliation provision, Plaintiff has failed to provide any evidence that Defendants discriminated against them based on genetic information, a prerequisite to bringing an anti-retaliation claim under GINA.").

Still, Plaintiff's Response focuses on her refusal to fill out the accommodation forms that she deemed invasive.  [DE 26] at 13.  But that framing gets Plaintiff no closer to stating a claim.  First, the Amended Complaint contains no allegations that she initially communicated her GINA-specific concern to Defendants.  *See* [DE 21] ¶ 20 (stating vaguely that forms were "unreasonable, intrusive, and coercive").  Indeed, it is not clear whether Plaintiff even mentioned GINA at all when she first refused to fill out the forms.  *Cf. Ortiz v. City of San Antonio Fire Dept.*, 806 F.3d 822, 827 (5th Cir. 2015) ("The district court concluded that all but one of these activities were not protected by GINA because Ortiz did not in those instances mention GINA or genetic information.  This conclusion was not clearly or obviously wrong.").

Moreover, for retaliation that is based on opposition conduct, "[a] plaintiff must not only show that [s]he *subjectively* (that is, in good faith) believed that h[er] employer was engaged in unlawful employment practices, but also that h[er] belief was objectively reasonable in light of the facts and record presented." *Butler v. Ala. Dept. of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)).  Plaintiff does not allege her belief was objectively reasonable.  And, for the reasons more fully discussed below in analyzing her GINA discrimination claim, she failed to allege enough facts to permit a plausible inference that her belief was objectively reasonable.  For instance, she does not allege facts making it plausible that the forms sought protected genetic information rather than medical information to which GINA does not apply.  *See Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 826 (5th Cir. 2015) (highlighting GINA's distinction between genetic information

24

and medical information).  Count II should thus be dismissed as it pertains to GINA retaliation as well.

### C.  Count III (Constructive Discharge)

Defendant argues that constructive discharge is not a standalone cause of action.  [DE 24] at 16-17; [DE 31] at 6-7.  Plaintiff's Response acknowledges that constructive discharge is typically not treated as an independent statutory claim but asserts that the "Amended Complaint pleads constructive discharge as both a distinct theory of liability and as an adverse action supporting her ADA, GINA, and retaliation claims."  [DE 26] at 20.  Defendant is right.

"Constructive discharge qualifies as an adverse employment decision."  *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 n.2 (11th Cir. 1997); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1230 (11th Cir. 2001).  "To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in her position would have been compelled to resign.'"  *Poole*, 129 F.3d at 553 (quoting *Thomas v. Dillard Dep't Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir.1997)).

However, courts in the Eleventh Circuit generally do not recognize a separate or standalone cause of action for constructive discharge.  *See Torres v. Pasco Cnty. Bd. of Cnty. Commissioners*, No. 21-CV-892, 2021 WL 3550369, at *5 (M.D. Fla. Aug. 11, 2021) ("Defendant seeks dismissal of Count 6, arguing that constructive discharge is not a distinct cause of action. The Court agrees."); *Burks v. Wellstar Health Sys., Inc.*, No. 23-CV-5807, 2024 WL 5320187, at *3 (N.D. Ga. Dec. 2, 2024) ("[T]here is *no cause of action* under the ADA for constructive discharge."); *Kimsey v. Akstein*, 408 F. Supp. 2d 1281, 1296 (N.D. Ga. 2005) ("This Court is not aware of, and the parties have not presented, any authority suggesting that constructive discharge is a separate cause of action under federal law."); *Walsh v. City of Ocala*, No. 18-CV-402-OC-30, 2019 WL

25

4395297, at *7 (M.D. Fla. June 17, 2019) ("While constructive discharge can qualify as an adverse employment action for purposes of federal discrimination claims, the Court is unaware of, and the parties have not offered, any authority suggesting that constructive discharge is a separate cause of action under federal law."), *report and recommendation adopted*, 2019 WL 3297248 (M.D. Fla. July 23, 2019).  *But see MacMartin v. Marine Mgmt. Servs., Inc.*, No. 22-CV-610, 2023 WL 9469635, at *10 (M.D. Fla. Feb. 7, 2023) ("A constructive discharge claim may stand alone or be alleged as the adverse action suffered" (citation omitted)), *report and recommendation adopted as modified*, 2023 WL 9469397 (M.D. Fla. Mar. 21, 2023).

Based on the weight of authority, Count III should be dismissed because constructive discharge is not a standalone cause of action.  Plaintiff's allegations in Count III are relevant only to the extent that they establish an adverse employment action against her.  Further, Plaintiff admits in the Amended Complaint that "[c]onstructive discharge is not pled as an independent cause of action, but as the adverse employment action . . . ."  [DE 21] ¶ 132.  Therefore, Count III should be dismissed.

### D.  Count IV (Hostile Work Environment Based on Disability)

Defendants move to dismiss Count IV, arguing that "Plaintiff has failed to sufficiently plead a hostile work environment . . . ."  [DE 24] at 14.  Assuming such a claim exists, I agree.

The Eleventh Circuit has not expressly determined in a published opinion whether the ADA supports a hostile-work-environment claim.  *Narvaez v. Fla. Health Scis. Ctr.*, No. 23-CV-2195, 2024 WL 167260, at *3 (M.D. Fla. Jan. 16, 2024); *Kelly v. Wal-Mart Stores E., LP*, No. 18-CV-149, 2019 WL 1066065, at *6 (M.D. Ala. Feb. 15, 2019), *report and recommendation adopted*, 2019 WL 1061663 (M.D. Ala. Mar. 6, 2019); *Pelz v. City of Huntsville*, No. 19-CV-01587, 2023 WL 7211774, at *7 (N.D. Ala. Sept. 20, 2023).  Yet the Eleventh Circuit has assumed without

26

deciding that an employee can bring a disability-based hostile-work-environment claim. *See Stewart v. Jones Util. & Contracting Co. Inc.*, 806 F. App'x 738, 741 (11th Cir. 2020) ("[W]e assume for purposes of this opinion that an ADA hostile-work-environment claim exists as well."). Moreover, "several other circuits have concluded that the ADA provides a cognizable claim for a disability-based hostile work environment." *Cooper v. CLP Corp.*, 679 F. App'x 851, 853 n.2 (11th Cir. 2017). Since the parties do not address the issue, I assume that the ADA allows for a hostile-work-environment claim premised on disability.

"To state a claim for hostile work environment, a plaintiff must allege that: (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment must have been based on a protected characteristic of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such environment under either a theory of vicarious or direct liability." *Usai v. Club Mgmt. Mia. II, LLC*, 801 F. Supp. 3d 1295, 1321 (S.D. Fla. 2025); *see Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

In the Motion, Defendants primarily challenge Plaintiff's claim for hostile work environment on elements three and four. *See* [DE 24] at 14-15. Defendants argue that Plaintiff does not adequately tie her vague assertions of mistreatment to her disabilities and that what she does link does not meet the "severe or pervasive" standard. *Id.* Although determining whether disability-based harassment is "severe or pervasive" is often better determined at the summary-judgment stage rather than on a motion to dismiss, *see Peragine v. Fla. Dep't of Transp.*, No. 25-80460-CIV, 2025 WL 2249982, at *5 (S.D. Fla. Aug. 7, 2025) (citation omitted), "Plaintiff still has the burden of alleging sufficient facts that make [it] plausible that she suffered severe [or]

27

pervasive harassment . . . ." *Edwards v. Ambient Healthcare of Ga., Inc.*, No. 15-CV-0411, 2015 WL 13298082, at *3 (N.D. Ga. Oct. 23, 2015), *report and recommendation adopted*, 2016 WL 8856695 (N.D. Ga. Mar. 24, 2016), *aff'd*, 674 Fed. App'x 926 (11th Cir. 2017). The "severe or pervasive" analysis contains two components: the plaintiff's work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citation omitted). Critically, "'the sporadic use of abusive language,' 'simple teasing, offhand comments, and isolated incidents (unless extremely serious)' are generally insufficient to meet the standard for objective severity." *Williams v. Hous. Auth. of Savannah, Inc.*, 834 Fed. App'x 482, 491 (11th Cir. 2020) (quoting *id.*).

Plaintiff fails to state a claim for hostile work environment under this framework. First, although she alleges a myriad of circumstances that she thinks show severe or pervasive harassment by Defendants because of her disabilities (like exclusion from communications, reassignment of duties, refusal to clarify the supervisory chain, retaliatory oversight, micromanagement, and surveillance), Plaintiff does little to raise a plausible inference that the alleged harassment was *based on* Plaintiff's disabilities. *See generally* [DE 21].

A cursory review of Plaintiff's attachments to the Amended Complaint confirms as much. For example, Plaintiff alleges that she sent an email on February 12, 2025, to her supervisors. [DE 21] ¶ 26. In Plaintiff's own words, "This email marked Plaintiff's first documented internal complaint of hostile work environment and retaliation *directly tied to her disabilities and accommodation requests*." [DE 21] ¶ 27 (emphasis added). But the attached email contradicts this allegation. *See Turner v. Williams*, 65 F.4th 564, 584 n.27 (11th Cir. 2023) ("If an exhibit attached to a complaint contradicts the allegations about the exhibit set forth in the complaint itself,

28

the exhibit controls." (citation omitted)).  In the attached email, Plaintiff reports on challenges that her work team, "the SCA RAs," have experienced.  [DE 21] at 44-45.  The email does not reference harassment of Plaintiff because of her disability.  *See id.*  The closest Plaintiff comes to doing so is by stating the following: "Cordless headphones I asked Crystal."  *Id.* at 44.  This nonsensical sentence does not support the harassment-based allegations in the Amended Complaint.  The mere fact that the "exclusionary behaviors" described in the email occurred soon after Plaintiff's "documented sickle cell crisis" does not raise a plausible inference that Defendants harassed Plaintiff because of her disability, as Plaintiff herself alleges that her whole work team experienced the supposed harassment, not just her.  *See id.* ¶¶ 28-29.  The allegations related to February 12, 2026 email are emblematic of much of the Amended Complaint.  *See, e.g.*, *id.* at 48-49 (attaching April 4, 2025 email in which Plaintiff makes claims about "retaliation" and "harassment" that is "severe and pervasive" but refers only to "workplace culture" generally rather than specifying disability discrimination against Plaintiff).

Even so, in her Response, Plaintiff points to four instances that she insists are sufficient to allege disability-based harassment of Plaintiff by Defendants.  *See* [DE 26] at 16.  The first instance is when a director stated in a meeting that Plaintiff was "acting erratic" after Plaintiff had objected to being excluded from a team meeting and sent an email to the HR department supposedly invoking her ADA and GINA rights.  *Id.*; [DE 21] ¶¶ 40-45.  The second instance is where a manager "loudly embarrassed" Plaintiff by stating that she did not think Plaintiff should get a cordless headset and that other employees would want cordless headsets if Plaintiff got one.  [DE 26] at 16; [DE 21] ¶¶ 57-60.  The third instance was a denial of promotion to Plaintiff by two directors and a representative from the HR department under a policy requiring an employee to be in their current position for twelve months before being eligible for a promotion, which Plaintiff

29

alleges was selectively applied or possibly fabricated. [DE 26] at 16; [DE 21] ¶¶ 33-43; [DE 21] at 41-43. The fourth instance is the lockdown incident during which Plaintiff and other employees at the office were forced to stay in place and prevented from evacuating while a "credible threat" was reported inside the facility. [DE 26] at 16; [DE 21] ¶¶ 53-56.

However, these allegations are not enough. Starting with the lockdown incident, Plaintiff expressly alleges that the lockdown started because of an external threat and that numerous other employees were affected. Plaintiff does not allege that anybody singled her out and disparaged her because of her disability, so this instance raises no inference of harassment based on disability. Next, the alleged denial of a promotion—while potentially actionable as an adverse employment action—is not the kind of severe, abusive, or offensive act that creates or constitutes a hostile work environment. It is better considered under the concept of retaliation rather than the concept of hostile work environment because claims for hostile work environment do not usually depend on a tangible employment action. *See Bonner v. Sarasota Cnty. Sch. Bd.*, No. 8:19-CV-2740-T-33AEP, 2020 WL 495169, at *3 (M.D. Fla. Jan. 30, 2020); *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004); *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008). Because Plaintiff alleges a claim for disability-based harassment premised on a hostile work environment, the denial of a promotion does not move the needle and thus does not help her state a claim as to this count.

The remaining allegations boil down to two stray remarks that do not even explicitly mention Plaintiff's disabilities. *See* [DE 21] ¶ 58 ("I don't think you should get a headset, but because Vanessa said to order them [sic] she said yes[.] . . . [O]ther employees would want one if you get a headset.'"); *id.* ¶ 44 ("Jewell, now you're acting erratic." (emphasis removed)). These remarks, even if hurtful, hardly amount to the kind of objectively offensive, hostile, and abusive

30

treatment that satisfies the "severe or pervasive" standard.  Plaintiff thus has not alleged sufficient factual content from which it could be plausibly inferred that a reasonable person would find a hostile work environment existed due to disability-based harassment of Plaintiff.  Count IV should be dismissed. *See Williams*, 834 Fed. App'x at 491.

### E.  Count V (Interference with Rights Under GINA)

Plaintiff alleges that Defendants violated GINA by issuing Plaintiff an overbroad medical form that required disclosure of statutorily protected genetic information.[10]  *See* [DE 21] ¶¶ 148-153.  I conclude Plaintiff fails to state a claim under GINA because, although the statute does make it illegal for an employer to request or demand protected information from an employee, the Amended Complaint does not contain sufficient factual allegations to raise a plausible inference that Defendants did so.

Under GINA, employers may not "request, require, or purchase *genetic information* with respect to an employee or a family member of the employee . . . ."  42 U.S.C § 2000ff-1(b) (emphasis added).  An individual's "genetic information" is "(i) such individual's genetic tests, (ii) the genetic tests of family members of such individual, and (iii) the manifestation of a disease or disorder in family members of such individual." *Id.* § 2000ff(4)(A).  "The term 'genetic test' means an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, that detects genotypes, mutations, or chromosomal changes." *Id.* § 2000ff(7)(A).  Based on this language,

---

[10] The allegations in this count of the Amended Complaint are vague and sparse, making it difficult to understand what exactly Plaintiff is alleging.  Relatedly, Plaintiff's Response is internally inconsistent, such as by stating that she objected to giving information but also that Defendants misused the same information.  *See* [DE 26] at 10-12.  It also conflates distinct legal concepts, such as by basing Count V on an improper disclosure and on retaliation for protected conduct.  *See id.*  What Plaintiff's Response does make clear, however, is that the crux of her substantive GINA claim is that Defendants required her to provide information protected under GINA, allegedly violating her rights.

GINA makes a "statutory distinction between 'medical information' and 'genetic information.'" *Ortiz*, 806 F.3d at 826; *see also Jackson v. Regal Beloit Am., Inc.*, No. CV 16-134-DLB-CJS, 2018 WL 3078760, at \*15 (E.D. Ky. June 21, 2018) ("[A]n employer does not violate GINA through 'the use, acquisition, or disclosure of medical information that is not genetic information about a manifested disease, disorder, or pathological condition of an employee . . . including a manifested disease, disorder, or pathological condition that has or may have a genetic basis.'" (alteration in original) (quoting 42 U.S.C. § 2000ff-9)).

Despite the general prohibition on employers requesting certain genetic information from an employee, GINA includes multiple exceptions. *Williams v. Graphic Packaging Int'l, Inc.*, 790 F. App'x 745, 754 (6th Cir. 2019); *see* 42 U.S.C § 2000ff-1(b)(1)-(6). For example, "if 'an employer inadvertently requests or requires family medical history of the employee or family member of the employee,' then the employer has not violated GINA." *Williams*, 790 F. App'x at 754 (quoting 42 U.S.C. § 2000ff-1(b)(1)); 29 C.F.R. § 1635.8(b)(1)(i).

Here, Plaintiff fails to allege enough factual content to raise a plausible inference that Defendants violated § 2000ff-1(b) by sending her forms to fill out for her accommodation requests under the ADA. For starters, Plaintiff's allegations are conclusory. She alleges that the forms sought more information than necessary for accommodations, but these allegations do not contain enough factual content to raise a plausible inference that the form sought *genetic* information (as defined by GINA) rather than medical information to which GINA does not apply. Plaintiff's legal conclusion is not enough. *See Iqbal*, 556 U.S. at 678.

Moreover, the main form at issue appears to contradict Plaintiff's allegations rather than support them. As Plaintiff acknowledges, the form is titled "Medical Information Request Form." [DE 26] at 11; [DE 24-1] at 1. The second section of the form, which a doctor fills out, asks the

doctor to identify the "physical or mental impairment (medical diagnosis)." [DE 24-1] at 2. It then asks about the effects or limitations of the condition and how these effects or limitations affect the employee. [DE 24-1] at 2. The form's questions do not raise a plausible inference that the form is seeking genetic information as opposed to general medical information. Importantly, as Defendants point out, the form contains an express, eight-line GINA disclaimer asking the doctor "not provide any genetic information when responding to this request for medical information." *Id.* As Plaintiff herself alleges, she already disclosed her sickle cell condition to Defendants before being issued the forms for disability accommodation. [DE 21] ¶ 19. Plaintiff's allegations do not suggest Defendants demanded disclosure of the condition itself.[11] Indeed, Plaintiff relies on her disclosure of her condition to Defendants as an invocation of the ADA's protections. *See id.*

Still, Plaintiff argues that, under promulgated regulations, "an employer cannot avoid GINA violations by inserting a disclaimer if the substance of the request is reasonably likely to elicit genetic information." [DE 26] at 12 (citing 29 C.F.R. § 1635.8(b)(1)(i)). Beyond not elaborating how the form is likely to elicit genetic information (and it is hard to see how one could

---

[11] Plaintiff's theory appears to be that Defendants "risked eliciting family medical history and genetic information tied to Plaintiff's sickle cell condition, an inheritable blood disorder . . . ." [DE 26] at 11-12. But it is important to note that the information protected by GINA does not include "medical information that is not genetic information about a manifested disease, disorder, or pathological condition of an employee or member, *including a manifested disease, disorder, or pathological condition that has or may have a genetic basis*." 42 U.S.C. § 2000ff-9 (emphasis added). Therefore, even if Plaintiff's sickle cell condition is "an inheritable blood disorder," that does not turn ordinary medical information about Plaintiff's condition into protected "genetic information." Again, the statute defines covered "genetic information" as information about the individual's genetic tests, genetic tests of family members of such individual, or the manifestation of a disease or disorder in family members of such individual. *Id.* § 2000ff(4)(A). So information about the manifestation of even an inheritable disease or disorder in Plaintiff does not constitute "genetic information" unless it is actual information about her genetic tests. Moreover, there is nothing in the at-issue form's request for a physician to identify the employee's medical diagnosis and its effects or limitations that plausibly seeks genetic tests of family members or family medical history.

plausibly infer that it is likely to elicit such genetic information), Plaintiff misunderstands the regulation. Mirroring GINA, the regulation states that "[t]he general prohibition against requesting, requiring, or purchasing genetic information does not apply: (1) Where a covered entity inadvertently requests or requires genetic information of the individual or family member of the individual." 29 C.F.R. § 1635.8(b). Although the regulation defines "request" to include "making requests for information about an individual's current health status in a way that is likely to result in a covered entity obtaining genetic information," *id.* § 1635.8(a), the regulation also makes clear that the general prohibition does *not* apply when an entity *inadvertently* requests genetic information. *Id.* § 1635.8(b)(1). And the regulation lays out a disclaimer, establishing that if a covered entity uses that disclaimer, "any receipt of genetic information in response to the request for medical information will be deemed inadvertent[.]" *Id.* § 1635.8(b)(1)(i)(B). The at-issue form contained a GINA disclaimer that is substantively identical to the one provided in the regulation that Plaintiff cites. *Compare* [DE 24-1] at 2, *with* 29 C.F.R. § 1635.8(b)(1)(i)(B). Because the language in the at-issue form's disclaimer is nearly identical to the disclaimer in the regulation, any genetic information requested or received despite the disclaimer would necessarily be deemed inadvertent and thus not a GINA violation. 29 C.F.R. § 1635.8(b)(1)(i)(B); 42 U.S.C. § 2000ff-1(b)(1) (exempting inadvertent requests for genetic information); *Branson v. Caterpillar, Inc.*, No. 23 CV 14329, 2024 WL 3823157, at *4 (N.D. Ill. Aug. 14, 2024) ("[A]n employer can avoid liability by properly warning an individual to withhold genetic information in responding to a request for medical information."); *Montgomery v. Union Pac. R.R. Co.*, No. CV-17-00201-TUC-RM, 2019 WL 1787326, at *4 (D. Ariz. Apr. 24, 2019) ("Under GINA, an employer who uses the specified disclaimer language is absolved of any liability." (citing 29 C.F.R. § 1635.8(b)(1)(i)(B))).

34

In short, Plaintiff has not adequately alleged that Defendants requested or required genetic information as that term is defined in GINA. In addition, the disclaimer establishes that *any* genetic information received in spite of the disclaimer would be treated as inadvertent and thus exempt from GINA's general prohibition on requesting genetic information. Count V should be dismissed.

### F. Count VI (Negligent Supervision and Retention)

Defendants argue that Count VI fails for three reasons: (1) a claim for negligent supervision and retention cannot be based on underlying statutory violations with no corresponding tort recognized at common law; (2) Plaintiff has not satisfied Florida's impact rule applicable to most negligence claims; and (3) worker's compensation law provides the exclusive remedy for an employee injured by negligence in the workplace. [DE 24] at 15-16; [DE 31] at 7-8. I conclude the first two arguments are dispositive. Count VI should be dismissed.

"To state a cause of action for negligent supervision or negligent retention under Florida law the claimant must allege: (1) the existence of a relationship giving rise to a legal duty to supervise; (2) negligent breach of that duty; and (3) proximate causation of injury by virtue of the breach." *Albra v. City of Fort Lauderdale*, 232 F. App'x 885, 888 (11th Cir. 2007) (citing *Roberson v. Duval Cnty. Sch. Bd.*, 618 So. 2d 360, 362 (Fla. 1st DCA 1993)); *see also Nicholson v. City of Miami*, No. 22-CV-21268, 2022 WL 17073684, at *5 (S.D. Fla. Nov. 17, 2022) ("Plaintiff must show that '(1) the agent/employee/contractor was incompetent or unfit to perform the work; (2) the employer knew or reasonably should have known of the particular incompetence or unfitness; and (3) the incompetence or unfitness was a proximate cause of the plaintiff's injury.'" (quoting *Witover v. Celebrity Cruises, Inc.*, 161 F. Supp. 3d 1139, 1148 (S.D. Fla. 2016))).

However, "the underlying wrong allegedly committed by an employee in a negligent supervision or negligent retention claim must be based on an injury resulting from a tort [that] is recognized under common law." *Borenstein v. Williams Island Prop. Owners Ass'n, Inc.*, No. 16-25182-CIV, 2019 WL 1406466, at *4 (S.D. Fla. Mar. 28, 2019) (alteration in original) (quoting *Scelta v. Delicatessen Support Servs., Inc.*, 57 F. Supp. 2d 1327, 1348 (M.D. Fla. 1999)); *see Castleberry v. Edward M. Chadbourne, Inc.*, 810 So. 2d 1028, 1030-31 (Fla. 1st DCA 2002); *Tercier v. Univ. of Mia., Inc.*, 383 So. 3d 847, 853 (Fla. 3d DCA 2023). A violation of a statutory provision that is not rooted in common law obviously cannot be the basis of a common law injury. *See Foster v. Select Med. Corp., Inc.*, No. 6:11-CV-1234-J-37GJK, 2012 WL 1415499, at *10 (M.D. Fla. Apr. 24, 2012). In *Borenstein*, for example, this Court held that a former employee failed to state a claim for negligent retention and supervision against a former employer partly because the former employee's allegations of harassment and discrimination did not constitute an underlying tort recognized at common law. 2019 WL 1406466, at *3-4. This Court explained, "Because Florida law does not recognize a common law cause of action for harassment or discrimination, Florida law cannot recognize a common law action based on the negligent failure to maintain a workplace that is free of discrimination or harassment." *Id.* at *4; *see also Footstar Corp. v. Doe*, 932 So. 2d 1272, 1278 (Fla. 2d DCA 2006) (Casanueva, J., concurring specially) ("[I]n order to recognize a common law cause of action based on the alleged negligent failure to maintain a workplace free of sexual harassment, there must first exist a common law cause of action for sexual harassment, but Florida does not recognize such a cause of action." (citing *Scelta*, 57 F. Supp. 2d at 1348)).

In this case, Plaintiff fails to state a claim for negligent supervision and retention because she fails to allege an underlying wrong that is recognized by Florida common law. Ignoring for a

moment Plaintiff's express incorporation of the 153 previous paragraphs of the Amended Complaint, the only underlying wrongs she seemingly references in Count VI appear to relate to statutory violations. *See* [DE 21] ¶¶ 155, 160. Plaintiff references the ADA, GINA, Title VII, and the Florida Civil Rights Act. *Id.* Her reference to these statutes is unsurprising, considering that the rest of Plaintiff's Amended Complaint is primarily based on allegations of harassment and discrimination under them. However, "[b]ecause Florida law does not recognize a common law cause of action for harassment or discrimination, Florida law cannot recognize a common law action based on the negligent failure to maintain a workplace that is free of discrimination or harassment." *Borenstein*, 2019 WL 1406466, at \*4. Accordingly, like the former employee in *Borenstein*, Plaintiff has failed to state a claim for negligent supervision or retention because she failed to allege an underlying wrong that is recognized at common law. *See id.*

In her Response, however, Plaintiff resists this conclusion by trying to reframe her claim for negligent supervision and retention, such as by suggesting the claim is based on additional underlying conduct like the lockdown incident that Plaintiff insists constitutes false imprisonment. *See* [DE 26] at 17-18. But her attempts are unavailing. Putting aside the fact that Count VI gives no indication of relying on these allegations for the supposed false imprisonment beyond incorporating everything that came prior to Count VI, the allegations for the tort are also far too vague and conclusory to suggest the existence of an underlying wrong for purposes of pleading negligent supervision and retention. *See Acts Ret.-Life Communities Inc. v. Estate of Zimmer*, 206 So. 3d 112, 115 (Fla. 4th DCA 2016) ("It is necessary that the underlying wrong—the actions of the employee or servant—be a tort."); *cf. Verde v. Pasco Cnty. Sheriff*, No. 20-CV-317, 2021 WL 597939, at \*10 (M.D. Fla. Feb. 16, 2021) (reasoning that claim for negligent supervision and retention failed because insufficient factual support was offered to support underlying tort of false

arrest); *Tercier*, 383 So. 3d at 853-54 (holding plaintiff failed to state claim for negligent supervision where complaint "fails to reveal any intentional tort" by defendant's agents and instead included, among other things, "various conclusory allegations of purportedly 'discriminatory' acts").

Even if the allegations for false imprisonment were less vague and conclusory, Plaintiff does not allege a sufficient connection between the tort and the aggravation of her sickle cell condition and spinal injury. In addition, the other allegations that Plaintiff claims go beyond mere statutory rights similarly do not suffice to state a claim. Put plainly, Plaintiff provides nothing to raise a plausible inference that the actions of Defendants' agents or employees constitute an underlying tort recognized at common law. Count VI should be dismissed on this basis alone.[12]

But even if Plaintiff adequately alleged an underlying tort, Count VI still fails because of Florida's impact rule. Claims for negligent supervision and retention are limited by Florida's impact rule. *See G4S Secure Sols. USA, Inc. v. Golzar*, 208 So. 3d 204, 208-10 (Fla. 3d DCA 2016). "The impact rule, as applied in Florida, requires that 'before a plaintiff can recover damages for emotional distress caused by the negligence of another, the emotional distress suffered must flow from physical injuries the plaintiff sustained in an impact.'" *Fla. Dept. of Corr. v. Abril*, 969 So. 2d 201, 206 (Fla. 2007) (quoting *R.J. v. Humana of Fla., Inc.*, 652 So.2d 360, 362 (Fla. 1995)). "The rule actually requires some impact on the plaintiff, or, in certain situations, the manifestation

---

[12] Plaintiff also failed to allege how the underlying conduct of Defendants' employees was committed outside the scope of employment, providing another basis for dismissal. *See Buckler v. Israel*, 680 Fed. App'x 831, 834 (11th Cir. 2017) ("Under Florida law, a claim for negligent hiring, retention, or supervision requires that an employee's wrongful conduct be committed outside the scope of employment." (citing *Mallory v. O'Neil*, 69 So. 2d 313, 315 (Fla. 1954))); *Yule v. Ocean Reef Cmty. Ass'n*, No. 19-10138-CIV, 2020 WL 3051505, at *11 (S.D. Fla. June 8, 2020) ("[T]o state a claim for negligent retention or negligent supervision, Yule must allege that Ritz's alleged conduct was 'outside the scope' of his employment with the ORCA Entities.").

of severe emotional distress such as physical injuries or illness." *Id.* (citing *Gracey v. Eaker*, 837 So. 2d 348, 355 (Fla. 2002)).  Plaintiff does not allege that she suffered any physical impact from the underlying conduct of Defendants' agents or employees.  Instead, Plaintiff alleges that "hostile working conditions" and "Defendants' refusal to accommodate" aggravated her sickle cell condition and lumbar spine injury.  [DE 16] at 18.  Yet indirect aggravation of a condition, i.e., aggravation not due to any physical contact, does not satisfy the impact rule under these circumstances.  *Cf. Gonzalez-Jimenez De Ruiz v. United States*, 231 F. Supp. 2d 1187, 1201-02 (M.D. Fla. 2002) ("The Court is unable to conclude that the alleged exacerbation of a pre-existing medical condition, such as diabetes or asthma, is sufficient to establish a physical impact directly flowing from the conduct of the Defendant."), *aff'd*, 378 F.3d 1229 (11th Cir. 2004); *see also Elliott v. Elliott*, 58 So. 3d 878, 882 (Fla. 1st DCA 2011) (citing *id.*).

In short, Count VI should be dismissed for two reasons.  First, Plaintiff failed to allege facts showing an underlying wrong committed by an employee or agent that qualifies as a common law tort rather than a statutory violation.  Second, even assuming Plaintiff properly alleged an underlying tort that could qualify for purposes of negligent retention and supervision, Plaintiff failed to allege enough factual content to satisfy the impact rule.  Because these two reasons are each sufficient to dismiss the claim, I do not address Defendants' argument on worker's compensation.

## CONCLUSION

In short, the Amended Complaint is a shotgun pleading and fails to state a claim on most of its claims.  However, Plaintiff should be given a chance to amend her allegations.  *See Johnson*, 2023 WL 7483830, at *2; *see also Sifford v. Ford*, 701 F. App'x 794, 796 (11th Cir. 2017) ("Generally, a district court must *sua sponte* provide a *pro se* plaintiff at least one opportunity to

39

amend his complaint, even where the plaintiff did not request leave to amend."). Although Plaintiff has already amended her complaint once in response to Defendants' original Motion to Dismiss, I am cognizant of the fact that Plaintiff is *pro se* and has not had the benefit of a judicial ruling on her allegations. Given these circumstances, and the fact that amendment does not appear to be futile (at least on some of the alleged causes of action), Plaintiff should receive leave to amend.

For the foregoing reasons, I respectfully **RECOMMEND** that the Motion [DE 24] be **GRANTED IN PART**. The Amended Complaint [DE 21] should be **DISMISSED WITHOUT PREJUDICE** and **WITH LEAVE TO AMEND**.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge. Failure to timely file objections shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida, this 17th day of March 2026.

Jared M. Strauss
United States Magistrate Judge

40